890 A.2d 1036 (2005)
383 N.J. Super. 165
In the Matter of the PARENTAGE OF The Child of Kimberly ROBINSON.
Superior Court of New Jersey, Chancery Division, Family Part, Essex County.
Decided May 23, 2005.
*1037 William S. Singer, Belle Mead and Edward Barocas (American Civil Liberties Union of New Jersey), for plaintiffs Kimberly Robinson and Jeanne LoCicero.
Peter C. Harvey, Attorney General, for defendant State of New Jersey (Patrick DiAlmeida, Assistant Attorney General).
TALBERT, J.S.C.
On April 30, 2005, Kimberly Robinson gave birth to a daughter who had been conceived through alternative insemination.[1] Robinson and her same-gender partner, Jeanne LoCicero, ask this court, pursuant to the Artificial Insemination statute, N.J.S.A. 9:17-44, to declare LoCicero the other parent. The plaintiffs contend LoCicero should enjoy the statutory presumption of parenthood as a husband would. According to that Statute,
[I]f, under the supervision of a licensed physician and with the consent of her husband, a wife is inseminated artificially with semen donated by a man other than her husband, the husband is treated in law as if he were the natural father of a child thereby conceived.
Ibid. When a married couple meets the conditions of the statute, a presumption of paternity attaches at birth. The "child thereby conceived" receives the security and benefits of having two legal parents from the time she or he is born. The husband is, by operation of law, the natural father of the child. Ibid.
LoCicero and Robinson, both citizens of the United States and residents of New Jersey, contend the heart of the statute is parentage, which would apply to LoCicero, thereby challenging the supposition that the statute pertains solely to paternity.
The plaintiffs have lived openly in their same-gender relationship since the fall of 2003. While residing in Brooklyn, they became domestic partners under New York law on December 26, 2003 and married on August 7, 2004, in Niagara Falls, Ontario, Canada. The couple celebrated the marriage in September 2004 at a reception in New Jersey attended by both families. They are now residents of Essex County in a home jointly purchased with *1038 the express purpose of being closer to family and friends who would provide a support network once the plaintiffs started a family.
Robinson and LoCicero decided to have a child and Robinson agreed to be the birth mother. The plaintiffs worked with Dr. Caryn Selick, a medical doctor practicing in New York City, to perform the alternative insemination with sperm of an anonymous donor[2] purchased from the Fairfax Cryobank.
After perusing toddler photographs of sperm donors, the plaintiffs chose a donor with physical characteristics and an ethnic background similar to LoCicero. The plaintiffs hoped the child would then exhibit physical characteristics of both women making the identity of the birth mother less apparent. Coincidentally, the child's first name, Vivian, is the name of each plaintiff's grandmother and the child's surname is LoCicero.
During Robinson's eighth month of pregnancy and on March 21, 2005, Robinson and LoCicero filed a Verified Complaint, in several counts, to establish maternity. A memorandum of law and supplemental brief supported their application.
Plaintiffs argue in their brief "[p]ublic [p]olicy [c]onsiderations [f]avor [c]onstruing N.J.S.A. 9:17-44 to [c]over the [s]ituation before this Court." "New Jersey courts," the plaintiffs say, "have recognized the legal rights of families in circumstances outside the traditional mode of a heterosexual, married union and biological parenthood." "`To deny the children of same-sex partners the security of a legally recognized relationship with their second parent serves no legitimate state interest.' H.N.R. at 10, 666 A.2d 535."
The plaintiffs also assert in their brief that "[t]he [b]est [I]nterest of the [c]hild [w]ould be [s]erved by [c]onstruing the Artificial Insemination Statute to [a]pply to this [c]ase." Arguably, the benefits to a child of having two legal parents are numerous and would certainly include economic security such as the right to support, the right to inherit by intestacy from LoCicero and her family, and the right to inherit free of the fifteen percent New Jersey inheritance tax. See N.J.S.A. 54:34-2(a). Additionally, the child would be eligible for health insurance as a dependent of LoCicero's and would be entitled to insurance and social security benefits in the event of LoCicero's death. If Robinson pre-deceases LoCicero, the child's relationship with her would not be recognized, they argue, under parent/offspring law.[3]
Plaintiffs assert, in the alternative, the unconstitutionality of N.J.S.A. 9:17-44 if LoCicero is prohibited "from being adjudicated a parent of the child...." Such finding would be in violation of equal protection rights under this State's Constitution and of the protections of the New Jersey Law Against Discrimination ("LAD").
Finally, the plaintiffs had requested a determination prior to the birth of Robinson's child. The Court declined, for reasons stated on the record, to enter any order having to do with personhood, or lack thereof, prior to birth.[4]
*1039 Since the plaintiffs were challenging the constitutionality of the statute, they noticed the State of New Jersey through the Office of the Attorney General. The court held oral argument on April 12, 2005, the plaintiffs and the State appearing. The court permitted supplemental briefs to be submitted by April 29, 2005; the concluding appearance to be held on May 20, 2005.
At oral argument, the State advanced a "plain meaning" argument stating the Artificial Insemination statute speaks of "paternity" and, by logical inference, excludes "maternity." The State did not articulate any other interest.
In reaching its decision, the court considered legislative history beginning with the genesis of and the modifications to New Jersey's chapter on Bastardy Proceedings, the precursor of the New Jersey Parentage Act.
In 1973, a "revolution in the law of determination of parentage" occurred when the Uniform Law Commissioners of the National Conference of Commissioners on Uniform State Laws ("ULC") promulgated the Uniform Parentage Act. http://www.nccusl. org/Update/uniformact summaries/uniformacts-s-ups.asp. Prior to this, the United States Supreme Court had been addressing arcane depictions (and the attendant barriers) found in the existing Bastardy Proceedings, thus, making the "[t]he 1973 Uniform Parentage Act ... law for a new generation." Ibid. Rather than discriminating against children borne outside of wedlock, the new act exclaimed "[t]he parent and child relationship extends equally to every child and every parent regardless of the marital status of the parent. ..." Ibid. The ULC also advocated "rules establishing legal parentage for children conceived other than by sexual intercourse, [i.e., in vitro fertilization and artificial insemination] and possibly carried by a woman other than the legal mother." Ibid.
In 1982, the New Jersey Assembly and Senate considered omnibus reform and adopted the public policy embodied in the "Uniform Parentage Act." The State's legislative history reflects its concern about the economic responsibility that befalls the State when paternity is unknown.
It is in the State's best interest to insure that parents are identifiable..... The responsibility for supporting these children falls directly upon the mother or the taxpayer unless paternity is established.
New Jersey Comm'n on Sex Discrimination in the Statutes, "Sex Discrimination in Marriage and Family Law," at 18 (1981).
As the scientific boundaries of conception and fertilization have expanded, so has the definition of parent as recognized by the ULC when it issued revisions in 2000 and 2002. "Legal parenthood ... is more complicated" and can be, for example, the "one who carries a child to birth (rather than the one whose egg has been fertilized) ... [or] a man married to the birth mother at conception." http://www.nccusl.org/Update/uniformact summaries/uniformacts-s-ups.asp.
If a couple consents to any sort of assisted conception, and the woman gives birth to the resultant child they are the legal parents. A donor of either sperm or eggs used in an assisted conception may not be a legal parent under any circumstances.
....
The new Uniform Parentage Act is important to parents and children. We must recognize the obligations of parents in any possible combination and *1040 permutation of marriage of the parents, method for conception of the child, and arrangements that intended parents make to have children. Otherwise we have children for whom nobody has responsibility.... It is necessary law for the new century.
Ibid. (emphasis added). The ULC may not have contemplated same-gender parents in its expanded definition of family, but it did understand that dynamic times dictated law sensitive to the advances of science and to evolving family structures.
The average American family (generally thought to be mom, dad and two children) applies, in fact, to only 23.5% of the American population, a decrease from 45% in 1960. United States Census Bureau, (2000). Profile of General Characteristics for the United States. Some read this as a decline in the family tradition rather than an expansion of the definition. Nonetheless, there is no legislative history or case law showing the intent of and/or interpreting the Artificial Insemination Act within the context of a family headed by a same-gender couple. The Legislature, however, has established public policy on the thematic analysis to be given matters pertaining to children.
In custody disputes, judicial determinations will rest upon an amalgam of considerations all considered "in the best interest of the child." N.J.S.A. 9:2-4. See also Kinsella v. Kinsella, 150 N.J. 276, 696 A.2d 556 (1997) (holding that the "primary and overarching consideration in custody determination is the best interest of the child.") In the normal course, children do not appear and advocate for themselves during court proceedings focusing upon custody, parenting time, visitation. Hence, the Legislature, by establishing the "best interest of children" policy, compels the courts to do so. This focus is paramount and a child's interest can come before a parent's. In re Baby M, 217 N.J.Super. 313, 323, 525 A.2d 1128 (Ch. Div.1987), rev'd on other grounds, sub nom., Matter of Baby M, 109 N.J. 396, 537 A.2d 1227 (1988).
In adoptions, "N.J.S.A. 9:3-37 requires that the `act be liberally construed to the end that the best interests of children be promoted.'" In re Adoption of Two Children by H.N.R., 285 N.J.Super. 1, 6, 666 A.2d 535 (App.Div.1995). In H.N.R., the Appellate Division concluded "that the best interests of twins, [children of Mary and Hannah,] will be served by according them the full range of legal and financial benefits attendant upon a legally cognizable parental relationship" and thereby allowed adoption by a same-gender couple. Id. at 12, 666 A.2d 535. A parental relationship can exist between parent and child, regardless of the gender of both parents. Ibid. By reasonable extension, LoCicero cannot be excluded from parentage merely on the basis of gender.
As for the import of domestic partnership law and the Canadian marriage upon this issue, the facts show Robinson and LoCicero did register in New York as domestic partners on December 26, 2003. The registration has reciprocal recognition in New Jersey under our State's Domestic Partnership Act. N.J.S.A. 26:8A-6. According to that Act, "[a] domestic partnership, civil union or reciprocal beneficiary relationship entered into outside of this State, which is valid under the laws of the jurisdiction under which the partnership was created, shall be valid in this State." The Assembly Appropriations Committee made clear that "domestic partners is a status distinct from marriage.... [and] the status of domestic partnership neither creates nor diminishes individual partners' rights and responsibilities toward children...." N.J.S.A. 26:8A-1. The Act's purpose the Assembly Appropriations said, *1041 is to "creat[e] a mechanism ... for New Jersey to recognize and support the many adult individuals in this State who share an important personal, emotional and committed relationship with another adult." Ibid. The act neither creates nor does it diminish any rights domestic partners may have with respect to children.
Although Robinson and LoCicero are domestic partners, the plaintiffs and the State agree the Canadian marriage is irrelevant to the interpretation of the Artificial Insemination statute. Despite agreement on this issue, same-gender marriages are, and will continue to be, the focus of intense public and legislative attention, both locally and nationally. Although its recognition may not be a threshold issue in the case at bar, it is incumbent upon the court to ensure no public policy concerning same-gender marriages affects the court's ultimate determination.
If a marriage performed in a foreign jurisdiction would be void in New Jersey, "such marriages should not be recognized as valid." Bucca v. New Jersey, 43 N.J.Super. 315, 321, 128 A.2d 506 (Ch. Div.1957) (plaintiff married his niece in Marcellona, Italy). In Hennefeld v. Montclair, 22 N.J.Tax 166, 2005 WL 646650 (Tax 2005), the court concluded, in a case concerning a same-sex couple married under Canadian law, there was "no basis under New Jersey law that would allow recognition of that marriage."[5]
Attorney General Peter C. Harvey, on March 10, 2004, advised the State Registrar to desist in accepting license applications stating "New Jersey law does not permit same sex marriages." http://www.nj publicsafety.com/newsrelease 504/pr2004031 ob.html. "We continue to believe that, ultimately, the issue of same sex marriage is most appropriately addressed by the legislature." Ibid.
After this review of legislative history and public policy, the court concludes there is no prohibition barring the court's consideration of a case involving a same-gender couple married in a foreign jurisdiction. While the court agrees it need not decide the validity of the marriage, the fact of its occurrence is significant.
These plaintiffs have availed themselves of every legal opportunity open to them to declare they are committed domestic partners, a married couple and a dedicated family. If Robinson and LoCicero were permitted to marry in our State, they would certainly do so, as they did in Canada. The commitment they made to each other during the wedding in the foreign jurisdiction is the essence of a marriage and of the Artificial Insemination Statute in its reference to "husband" and "wife."
Before the decision to have a child, the couple held themselves before the world as life partnersa family. As with any life partners, they celebrated their union with family and friends, purchased a home jointly, carefully planned to have a child. The child's given name, Vivian, continues the universal family tradition of passing the name of elders to a newborn. Her surname is LoCicero. Plaintiff LoCicero is not required, under law or in equity, to take upon her the legal obligation of parentage. Her commitment, one could argue, is only to Robinson. Her voluntary effort to be recognized as a parent under the law, with its attendant obligations and responsibilities, evinces her desire, intention and commitment to be a parent to Vivian Ryan.
*1042 This court has before it strong public policy that establishes unequivocally the State's focus upon the best interests of children. The well being of our children is paramount and will, at times, take priority over the interest of parents. At bar is the applicability of the Artificial insemination statute which has as its underpinning the interest in identifying a child's parent for the benefit of the child and, secondarily, to repose financial responsibility upon that parent rather than upon the citizenry. New Jersey Comm'n on Sex Discrimination in the Statutes, Sex Discrimination in Marriage and Family Law, supra at 18. The designation of parent at birth is not limited by the strict definition of paternity. Rather, the individual seeking equal treatment under the Artificial Insemination statute must show indicia of commitment to be a spouse and to be a parent to the child.
As the Artificial Insemination statute requires, we have a child born within the context of a marriage with two spouses, the alternate insemination having been performed by the necessary medical professional. The non-birth mother wishes to have legal responsibility, thus, eliminating the State from having financial responsibility for the care of the child. The court is unable to discern any State's interest that would preclude LoCicero from the protection of the statute.[6]
On the facts certified, the court has no basis to question the emotional and psychological commitment of the plaintiffs to be parents who will act in the best interest of Vivian Ryan. LoCicero wishes to join her partner in being financially committed to the child. Under these circumstances, Vivian Ryan should not be left behind.
It is hereby ordered pursuant to the authority of the Artificial Insemination statute, N.J.S.A. 9:17-44(a), and within the confines of these factual findings, Jeanne LoCicero is presumed to be the parent of Vivian Ryan LoCicero, born April 30, 2005. This decision is nunc pro tunc, effective April 30, 2005, the date of the live birth.
NOTES
[1] The moving parties use "alternative," rather than "artificial," insemination to describe the process by which Vivian Ryan was conceived. Alternative insemination is a:

simple procedure using a squirting device (e.g. a syringe without a needle) to introduce semen into a woman's vaginal canal for the purpose of achieving pregnancy....
[T]he phrase is considered less offensive and more descriptive than the more common phrase "artificial insemination," which often connotes a sinister unnaturalness in religious contexts.
@ http://familypride. uwo.ca/glossary /glossary1.html.
[2] No agreement exists with the donor giving him any birthrights to the child.
[3] Although conceding adoption is available, the plaintiffs believe a two-year legal procedure places the legal status of the child in limbo unnecessarily. Adoption, they argue, should not be required in these circumstances.
[4] In footnote 2 of their supplemental brief, the Plaintiffs state they "recognize that, until birth, individual rights do not attach." See Fn. 2, Supp. Brief.
[5] Restricting marriage to couples that are members of opposite sex does not violate equal protection, under New Jersey Constitution. Lewis v. Harris, 378 N.J.Super. 168, 189, 875 A.2d 259 (App.Div.2005).
[6] "Appraisal of a constitutional defect begins with the assumption that the Legislature intended to act in a constitutional manner." Right to Choose v. Byrne, 91 N.J. 287, 311, 450 A.2d 925 (1982). "Unless compelled to do otherwise, courts seek to avoid a statutory interpretation that might give rise to serious constitutional questions." Silverman v. Berkson, 141 N.J. 412, 417, 661 A.2d 1266 (1995). "There is a strong presumption against finding legislation unconstitutional. `[I]t is well-recognized that the courts do not act as a super-legislature.' So statutes are presumed constitutional unless clearly repugnant to the Constitution." Camden Bd. of Ed. v. McGreevey, 369 N.J.Super. 592, 605, 850 A.2d 505 (App.Div.2004) (citation omitted). "If possible without frustrating the Legislature's basic design, we are obligated to construe the statutory provisions at issue here in a manner that saves them from invalidity on constitutional grounds." New Jersey v. May, 362 N.J.Super. 572, 583, 829 A.2d 1106 (App.Div.2003).