16 A.3d 386 (2011)
419 N.J. Super. 46
In the Matter of the Parentage of a Child by T.J.S. and A.L.S., h/w.
No. A-4784-09T4
Superior Court of New Jersey, Appellate Division.
Argued December 14, 2010.
Decided February 23, 2011.
*388 Donald C. Cofsky, Haddonfield, argued the cause for appellants T.J.S. and A.L.S., h/w (Cofsky & Zeidman, LLC, attorneys; Mr. Cofsky, of counsel and on the brief).
Kimberly E. Jenkins, Deputy Attorney General, argued the cause for respondent Department of Health and Senior Services (Paula T. Dow, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Ms. Jenkins, on the brief).
Before Judges PARRILLO, YANNOTTI and SKILLMAN.
The opinion of the court was delivered by
PARRILLO, P.J.A.D.
At issue is whether the New Jersey Parentage Act (Parentage Act), N.J.S.A. 9:17-38 to -59, recognizes an infertile wife as the legal mother of her husband's biological child, born to a gestational carrier, and, if not, whether the statutory omission violates equal protection by treating women differently than similarly-situated infertile men, whose paternity is presumed when their wives give birth during the marriage. For the following reasons, we hold that the Parentage Act does not intend maternity in such a circumstance absent adoption and, in determining the parentage of a child, the legislation does not offend constitutional principle.
The facts are undisputed. Plaintiffs, T.J.S. and A.L.S., husband and wife, were unable to have a child through "traditional" means because A.L.S. could not carry a child to term. Consequently, plaintiffs arranged for the in vitro fertilization (IVF) of an ovum furnished by an anonymous donor using the sperm of T.J.S.[1] In the *389 interim, plaintiffs entered into a gestational surrogacy agreement with A.F., who consented to act as the gestational carrier for plaintiffs. Following successful fertilization of the ovum, two viable human embryos were implanted into the uterus of the gestational carrier. The embryos were biologically related to T.J.S. and the anonymous ovum donor; thus, there is no genetic connection between the child born of this IVF procedure and either the gestational carrier or A.L.S.
Before the child's birth, plaintiffs sought from the Family Part a declaration of parentage under the Parentage Act and a pre-birth order directing that their names be listed on the birth certificate as the child's parents and preventing A.F. from being named as the mother. Plaintiffs expressly rejected adoption because the extended legal process would place the legal status of the child in limbo. Their complaint set forth: (1) the manner in which the child was conceived; (2) the consent of the gestational carrier to the voluntary termination, after delivery of the child, of any rights she may have to the child and to the filing of plaintiffs' complaint; and (3) the gestational carrier's proposed irrevocable relinquishment of any and all rights she may have to the child, which, by statute, N.J.S.A. 9:3-41(e), cannot occur until at least seventy-two hours after the birth. Plaintiffs did not notify the Department of Health and Senior Services, Bureau of Vital Statistics and Registration (Bureau or State Registrar) of their application for a pre-birth order.
The trial court ordered that the birth certificate to be placed on file for this child was to reflect T.J.S. as the father and A.L.S. as the mother, provided that, as to the latter, the gestational carrier, A.F., surrender her rights to the child seventy-two hours after giving birth. The child, T.D.S., was born on July 7, 2009. Three days later, the gestational carrier relinquished all parental rights to the child.
Shortly thereafter, the State Registrar learned of the pre-birth order and promptly moved to vacate the portion of the order directing A.L.S. to be listed as the mother on the child's birth certificate. Following argument, the trial court granted the State's motion, concluding that: (1) the State Registrar has standing in the matter by virtue of her "vital statutory responsibilities" to record birth records correctly and legally, N.J.S.A. 26:8-23 to -40.26; (2) the Parentage Act does not permit, either explicitly or implicitly, A.L.S. to be declared the parent through a pre-birth order adjudication; (3) the statute does not violate A.L.S.'s equal protection rights under Article I, paragraph 1 of the New Jersey Constitution; and (4) A.L.S.'s exclusive remedy is stepparent adoption pursuant to N.J.S.A. 9:3-48.[2]
On appeal, plaintiffs argue, as they did below, that the provisions of the Parentage Act conferring paternity upon a husband either presumptively, where the child is born to the wife during marriage, N.J.S.A. *390 9:17-43(a), or by operation of law, where the wife is artificially inseminated with donor sperm, N.J.S.A. 9:17-44, should be read gender neutrally to apply to the infertile wife as well and, if not so construed, are facially unconstitutional because they treat differently similarly-situated groupsinfertile married men and womenwithout sufficient justification. Plaintiffs' argument requires a brief review of the statutory framework.
Issued by the Bureau of Vital Statistics, birth certificates memorialize, among other facts, information concerning the relationship of a child to his or her natural or adoptive parents. N.J.S.A. 26:8-29. A birth certificate simply records the fact of parentage as reported by others; it neither constitutes a legal finding of parentage nor independently creates or terminates parental rights. In order for an individual's name to appear as a parent on a child's birth certificate, the Registration of Vital Statistics Act, N.J.S.A. 26:8-1 to -69, requires that a legally cognizable parent-child relationship exist under the Parentage Act.
The Parentage Act, adopted in 1983, is based upon the Uniform Parentage Act of 1973.[3] The Act was created to ensure that children born out of wedlock are treated the same as those born to married parents and to provide a procedure to establish parentage in disputed cases. Assembly Judiciary, Law, Public Safety and Defense Committee, Statement to Senate Bill No. 888, at 2 (Oct. 7, 1982). It was designed to "make the identification of a child's father easier and thereby reduce[ ] the number of children requiring public assistance." Fazilat v. Feldstein, 180 N.J. 74, 87, 848 A.2d 761 (2004).
The Act defines the "parent and child relationship" as "the legal relationship existing between a child and the child's natural or adoptive parents, incident to which the law confers or imposes rights, privileges, duties, and obligations. It includes the mother and child relationship and the father and child relationship." N.J.S.A. 9:17-39 (emphasis added). There are several means by which to establish a parental relationship under the Act: (1) genetic contribution, N.J.S.A. 9:17-41;[4] (2) gestational primacy, i.e., giving birth, N.J.S.A. 9:17-41(a); or (3) adoption, N.J.S.A. 9:17-41(c). In addition, a rebuttable presumption of paternity derives from the parties' legal relationship, i.e., marriage or its equivalent, when a child is born during the course of a marriage or within 300 days of its termination. N.J.S.A. 9:17-43(a)(1).[5] This presumption, that a man is the father of a child born to his wife, extends to a husband who consents to his wife being *391 inseminated with donor sperm under the supervision of a licensed physician. N.J.S.A. 9:17-44(a) (the Artificial Insemination Statute).[6]
Nowhere in the Act does the presumption of parentage under Section 43(a) extend to a wife whose husband, while married, fathers a child with another woman, N.J.S.A. 9:17-43(a)(1), or to a wife who simply acknowledges in writing her maternity of the child, N.J.S.A. 9:17-43(a)(6). On the contrary, where a husband has a child, born to another woman, while married to his wife, the wife may only establish a parental relationship with the child by adoption. N.J.S.A. 9:3-37 to -56.[7] Similarly, the Act contains no comparable analogue to Section 44 that renders an infertile wife, by operation of law, the natural mother of a child born to another woman artificially inseminated with the husband's sperm and with the wife's consent. Indeed, as noted in the adoption context, any such provision would conflict with the express legislative enactment affording a birth mother seventy-two hours to decide whether to relinquish the child before a surrender of her parental rights is deemed valid. N.J.S.A. 9:3-41(e).
Thus, contrary to the gender-neutral interpretation plaintiffs ask us to adopt, the plain language of the Act provides for a declaration of maternity only to a biologicallyor gestationallyrelated female and requires adoption to render A.L.S. the mother of T.D.S. N.J.S.A. 9:17-41. No alternative construction is plausible and nowhere in the statutory scheme may it be implied that maternity is established simply by the contractual or shared intent of the parties. Indeed, plaintiffs themselves acknowledge that the Act, as written, cannot be extended to confer maternity on A.L.S. at the moment of the child's birth, but would have to be rewritten to allow, at the very least, a seventy-two hour waiting period for A.F. to waive her parental rights to the child born to her. See N.J.S.A. 9:3-41(e). Simply put, the Legislature has determined when a woman is the legal mother of a child, N.J.S.A. 9:17-41(a), and it does not include the present circumstance.
It is this statutory gender-based classification of similarly-situated infertile married women and men that plaintiffs claim deprives them of constitutional protection by withholding from the former, without any legitimate justification, the parental status either presumptively or automatically bestowed on the latter. Such a claim must be evaluated against the backdrop of our State's equal protection jurisprudence.
As a threshold matter, we note that "every possible presumption favors the validity of an act of the Legislature." N.J. Sports & Exposition Auth. v. McCrane, 61 N.J. 1, 8, 292 A.2d 545, appeal dismissed sub nom., Borough of E. Rutherford v. N.J. Sports & Exposition Auth., 409 U.S. 943, 93 S.Ct. 270, 34 L.Ed.2d 215 (1972). In light of the co-equal but distinct responsibilities of the judicial and legislative branches of government, "we will not declare void legislation *392 unless its repugnancy to the Constitution is clear beyond a reasonable doubt." In re P.L.2001, Chapter 362, 186 N.J. 368, 392, 895 A.2d 1128 (2006) (internal citations omitted).
Article I, paragraph I of the New Jersey Constitution provides that "every person possesses the `unalienable rights' to enjoy life, liberty, and property, and to pursue happiness." Lewis v. Harris, 188 N.J. 415, 442, 908 A.2d 196 (2006). While our Constitution does not use the term "equal protection," our Supreme Court has interpreted this "expansive language ... to embrace [the] fundamental guarantee" of equal protection. Ibid. Like the federal Constitution, our Constitution "`protect[s] against injustice and against the unequal treatment of those who should be treated alike.'" Ibid. (quoting Greenberg v. Kimmelman, 99 N.J. 552, 568, 494 A.2d 294 (1985)).
Unlike the federal system, equal protection claims under the New Jersey Constitution are not analyzed according to a three-tier system of review (strict scrutiny, intermediate scrutiny, or rational basis). Rather, our courts have rejected this rigid approach, relying instead on a flexible balancing test in which the critical issue is "whether the differential classification is related substantially to the achievement of an important governmental objective." Tomarchio v. Twp. of Greenwich, 75 N.J. 62, 67, 379 A.2d 848 (1977); see also Rutgers Council of AAUP Chapters v. Rutgers, The State Univ., 298 N.J.Super. 442, 452, 689 A.2d 828 (App. Div.1997), certif. denied, 153 N.J. 48, 707 A.2d 151 (1998). The "substantial relationship" test requires the court to balance three factors: "the nature of the right at stake, the extent to which the challenged statutory scheme restricts that right, and the public need for the statutory restriction." Lewis, supra, 188 N.J. at 443, 908 A.2d 196 (citations omitted). If a right is toward the more "personal" end of the spectrum, the State must establish an even "`greater[ ] public need ... to justify governmental interference with the exercise of that right.'" Ibid. (quoting George Harms Constr. Co. v. N.J. Tpk. Auth., 137 N.J. 8, 29, 644 A.2d 76 (1994)).
Thus, how the right is defined or characterized is a crucial consideration in the equal protection analysis. Lewis, supra, 188 N.J. at 435, 908 A.2d 196; Greenberg, supra, 99 N.J. at 567, 494 A.2d 294. Here, no one disputes that parentage is a fundamental right. N.J. Div. of Youth & Family Servs. v. A.R.G., 179 N.J. 264, 285-86, 845 A.2d 106 (2004). However, A.L.S. does not have parental rights to the child born to A.F. because of the absence of any biological or gestational connection to the child. Although she may readily attain that status through adoption, the substantive right she is asserting is to be legally declared the mother of T.D.S. based solely on the parties' shared intent and by the most convenient, expedient and immediate means possible. Such a "right," we find, is neither enshrined in our Constitution nor so rooted in "the `traditions and [collective] conscience of our people... as to be ranked as fundamental.'" King v. South Jersey Nat'l Bank, 66 N.J. 161, 178, 330 A.2d 1 (1974) (quoting Griswold v. Connecticut, 381 U.S. 479, 493, 85 S.Ct. 1678, 1686, 14 L.Ed.2d 510, 520 (1965) (Goldberg, J., concurring)).
Having defined the nature of the right at issue, however, does not end our inquiry. Although the interest of an infertile wife in creating a legal parental relationship to her husband's child at the moment of birth is not a fundamental right, a law treating a similarly-situated husband differently in determining the parentage of a child is nevertheless subject to equal protection analysis. Lewis, supra, 188 N.J. at *393 442, 908 A.2d 196. We, therefore, next examine whether Sections 43 and 44 of the Parentage Act offend the equal protection principles of our State Constitution.
Germane to this analysis, gender-based classifications that discriminate "on an invidious basis" are automatically deemed "suspect" and create the need for "heightened scrutiny." Rutgers Council of AAUP Chapters, supra, 298 N.J.Super. at 453, 689 A.2d 828; see also Tomarchio, supra, 75 N.J. at 69, 379 A.2d 848. Accordingly, a statute should only pass constitutional muster under this "scrupulous and skeptical" approach if the court is "satisfied completely" that the gender-based classification "substantially advance[s]" the achievement of some clearly defined "important governmental objective." Tomarchio, supra, 75 N.J. at 69, 379 A.2d 848. In this regard, the State bears the burden of defining the "important governmental objectives" and justifying how the discriminatory treatment advances those objectives. Borough of Wrightstown v. Medved., 193 N.J.Super. 398, 402, 474 A.2d 1077 (App.Div.1984); see also In re Crichfield Trust, 177 N.J.Super. 258, 262, 426 A.2d 88 (Ch.Div. 1980).
By the same token, "[t]he right to equal protection does not require us to scrutinize gender distinctions that are based on real physiological differences to the same extent we would scrutinize those distinctions when they are based on archaic, invidious stereotypes about men and women." State v. Chun, 194 N.J. 54, 103, 943 A.2d 114 (2008). Indeed, the constitutional guarantee "does not demand that things that are different in fact be treated the same in law, nor that a [S]tate pretend that there are no physiological differences between men and women." Ibid. (citations and internal quotation marks omitted).
Governed by these principles, we discern no violation of equal protection in Section 43(a)'s differential classification. N.J.S.A. 9:17-43(a) is specific to men because the purpose of this provision is to address scenarios where a man is highly likely to be the biological father of a child. The legislative history of the Parentage Act unambiguously states that the "presumptions are intended to facilitate the flow of benefits from the father to the child." Assembly Judiciary, Law, Public Safety and Defense Committee, Statement to Senate Bill No. 888, at 2 (Oct. 7, 1982). Thus, the Legislature's intent in enacting N.J.S.A. 9:17-43(a) was to create paternity where there is a strong likelihood that the man is the biological father of the child so that the child can receive financial support from him. The Legislature did not intend to create paternity where the likelihood of a biological connection does not exist. This focus on the biological connection is further supported by Section (b) of the statute, which allows the presumption to be rebutted "by establishing that another man is the child's biological or adoptive father." N.J.S.A. 9:17-43(b).
Correspondingly, the plain language of Section 43(a) makes clear that A.L.S. cannot be presumed to be the legal mother of the child born to the gestational carrier because she is not the biological mother of the child. Rather, the child is biologically related to T.J.S. and the anonymous ovum donor. Therefore, the presumption of maternity based on the strong likelihood of a biological relationship cannot be extended to A.L.S.[8] Even if A.L.S. were afforded the *394 presumption of maternity by executing a written acknowledgement under N.J.S.A. 9:17-43(a)(6), that presumption would be rebutted under Section 43(b) since A.L.S. is neither the biological nor adoptive mother of the child.
Thus, Section 43(a)'s gender-based classification is substantially related to the achievement of an important governmental objective, namely facilitation of the determination of paternity where there is a strong likelihood of a biological relationship with the child so that the child is supported financially. Extending the presumption to women would not further this important objective because, where a woman does not give birth to a child, there is not a strong likelihood that she is biologically related to the child.[9]
A similar result obtains with respect to Section 44, which, as noted, confers paternity, by operation of law, upon a man whose wife, with his consent, has a child after being artificially inseminated with donor sperm. As a threshold matter, this provision clearly has no application here since it offers no authority for treating the husband, T.J.S., as the father, inasmuch as his wife, A.L.S., was not artificially inseminated. Rather, T.J.S.'s legal status as the father derives from his genetic contribution, N.J.S.A. 9:17-39, verifiable by blood *395 or genetic testing, N.J.S.A. 9:17-41(b),[10] a circumstance which, as noted, simply does not pertain to A.L.S.
As for Section 44's treatment of infertile husbands generally, this provision, on its face, applies only to artificial insemination. The provision addresses a very limited situation by removing the sperm donorin many cases an anonymous contributor from the parental equation while simultaneously eliminating the potential of having a child created who would have no legal father. N.J.S.A. 9:17-44(b).
There is simply no alternative interpretation possible that would extend Section 44's terms beyond that which the Legislature explicitly addressed to include other reproductive technologies such as the in vitro fertilization procedure at issue here, whereby an egg is fertilized by sperm outside the woman's body and the resulting embryo is then implanted into the woman's uterus for gestation. Indeed, plaintiffs acknowledge that the Legislature has not provided for this circumstance in the Parentage Act, and the Court in In re Baby M., 109 N.J. 396, 537 A.2d 1227 (1988), specifically declined to extend Section 44(a) to the circumstance at hand:
The Parentage Act's silence ... with respect to surrogacy, rather than supporting, defeats any contention that surrogacy should receive treatment parallel to the sperm donor artificial insemination situation. In the latter case the statute expressly transfers parental rights from the biological father, i.e., the sperm donor, to the mother's husband.... Our Legislature could not possibly have intended any other arrangement to have the consequence of transferring parental rights without legislative authorization when it had concluded that legislation was necessary to accomplish that result in the sperm donor artificial insemination context.
[Id. at 441 n. 10, 537 A.2d 1227.]
Aside from its non-applicability here, Section 44(a) has already withstood judicial scrutiny in the face of an equal protection challenge. In Baby M., the Sterns, a married couple where the wife was infertile, contracted with a woman to be artificially inseminated with the husband's sperm, carry the child to term, and then, after the child's birth, relinquish parental rights to the father and his wife. Id. at 411-12, 537 A.2d 1227. The surrogate mother initially surrendered the child to the father, but subsequently reconsidered her decision and fled with Baby M. Id. at 415, 537 A.2d 1227. At issue in the Sterns's enforcement action was whether the birth mother's rights were adequately protected because her rights to her child were automatically terminated under a pre-birth contract. Although voiding the surrogacy for hire contract on statutory and public policy grounds, id. at 411, 537 A.2d 1227, the Court nevertheless addressed and rejected the Sterns's equal protection challenge premised on the absence of a comparable provision in Section 44 granting full parental rights to the wife whose husband procreates with another woman with the shared understanding by all that the child will be the couple's child:
It is quite obvious that the situations are not parallel. A sperm donor simply cannot be equated with a surrogate mother. The State has more than a sufficient basis to distinguish the two situations even if the only difference is between the time it takes to provide sperm for artificial insemination and the time invested in a nine-month pregnancyso as to justify automatically divesting the *396 sperm donor of his parental rights without automatically divesting a surrogate mother.
[Id. at 450, 537 A.2d 1227.][11]
The Court's rationale is equally persuasive here. Under Section 44(a), paternity attaches to the infertile husband because of the sperm donor's lack of temporal, physical, and emotional investment in the child's creation. This stands in sharp contrast to the surrogate mother whose parental rights are deemed worthy of protection and thus stand in the way of the infertile wife's claim to automatic motherhood.
To be sure, the Court in Baby M. was dealing with a surrogate mother required by contract to relinquish her rights to the child before birth, which plaintiffs here do not request, as they recognize the necessity of a seventy-two hour waiting period. But the Legislature has not yet seen fit to recognize parentage in such a circumstance by writing in Section 44 the birthing mother's mandatory waiting period under N.J.S.A. 9:3-41(e).[12] The *397 fact that the Legislature has addressed the parentage issues raised by one kind of reproductive procedureartificial inseminationby relieving the sperm donor of the normal legal obligations of a father and at the same time imposing those obligations upon the husband of the married woman does not mean that the Legislature violated equal protection guarantees by failing to address the quite different legal issues raised by other reproductive procedures such as in vitro fertilization involved in this case. The Legislature is allowed to proceed incrementally in addressing the parentage issues presented by one form of reproductive procedure without also addressing those raised by other new reproductive procedures.
In the absence of a legislative response, plaintiffs have asked us to rewrite the statute to accommodate their circumstance. We decline the invitation. As the Court in Baby M. cautioned:
The Legislature has explicitly recognized the parent-child relationship between a child and its natural parents ... between adoptive parents and their adopted child ... and between a husband and his wife's child pursuant to the sperm donor provision.... It has not recognized any othersspecifically, it has never legally equated the stepparent-stepchild relationship with the parent-child relationship, and certainly it has never recognized any concept of adoption by contract. It can be contended with some force that the Legislature's statutory coverage of the creation of the parent-child relationship evinces an intent to reserve to itself the power to define what is and is not a parent-child relationship.

[109 N.J. at 442 n. 10, 537 A.2d 1227 (emphasis added).]
As if contemplating the very situation at hand, Chief Justice Wilentz quite presciently spoke to the need for legislative intervention in this area:
We do not underestimate the difficulties of legislating on this subject. In addition to the inevitable confrontation with the ethical and moral issues involved, there is the question of the wisdom and effectiveness of regulating a matter so private, yet of such public interest. Legislative consideration of surrogacy may also provide the opportunity to begin to focus on the overall implications of the new reproductive biotechnology in vitro fertilization, preservation of sperm and eggs, embryo implantation and the like. The problem is how to enjoy the benefits of the technology especially for infertile coupleswhile minimizing the risk of abuse. The problem can be addressed only when society decides what its values and objectives are in this troubling, yet promising, area.
[Id. at 469, 537 A.2d 1227.]
See also J.B. v. M.B., 170 N.J. 9, 31, 783 A.2d 707 (2001) (Zazzali, J., concurring).
We do not deny the intrinsic societal worth, emotional appeal, and compelling logic of granting A.L.S. parenthood to the child, T.D.S., provided the gestational carrier's *398 rights are protected during the statutory seventy-two hour "window" period. After all, the child is born within the context of a marriage, A.L.S. knowingly and freely agrees to assume legal responsibility for T.D.S., and no one disputes that it is in the child's best interest to have A.L.S.'s commitment legally recognized. But, as the State points out, the means chosen by the Legislature to create that status in this instance remains adoption, N.J.S.A. 9:3-50(b), rather than by operation of the Parentage Act. Indeed, the Legislature never amended either Sections 43(a) or 44 after Baby M. to eliminate the need for adoption in circumstances such as here.
We agree with the Court's intimation in Baby M. that, regarding so fundamental a societal relationship as that of parent and child, it is the Legislature's prerogative to define the terms and manner of its creation, and our role is limited to "constitutional adjudication," Lewis, supra, 188 N.J. at 460, 908 A.2d 196, to ensure that the means selected to establish parentage do not violate constitutional principles. Here, unlike California for instance, which defines the natural mother as the person "who intended to bring about the birth of a child that [sic] she intended to raise as her own[,]" Johnson v. Calvert, 5 Cal.4th 84, 19 Cal.Rptr.2d 494, 851 P.2d 776, 782 (Cal.), cert. denied, 510 U.S. 874, 114 S.Ct. 206, 126 L.Ed.2d 163 (1993), our Legislature has not seen fit to confer parenthood based solely on the declared intention of a party. In fact, the Court in Baby M., supra, specifically rejected intent as a means of establishing parenthood by deeming the traditional surrogate the child's legal mother over the wife of a man whose sperm impregnated the gestational carrier. 109 N.J. at 430, 466, 537 A.2d 1227.
This exclusion is not constitutionally offensive. Indeed, nothing in our Constitution or law provides that an adultmale or femalewith no biological or gestational connection to a child has a fundamental right to create parentage by the most expeditious or convenient method possible.
In sum, the Legislature, in recognizing genetic link, birth, and adoption as acceptable means of establishing parenthood, has not preferred one spouse over the other because of gender. And where both spouses are infertile, the law treats them identically by requiring adoption as the singular means of attaining parenthood. Where, however, only one of the spouses is infertile, an equal protection claim has not been articulated because their respective situations are not parallel and the Legislature is entitled to take these situational differences into account in defining additional means of creating parenthood. Thus, we are satisfied that the complained of disparate treatment is not grounded in gendered constructions of parenthood but in actual reproductive and biological differences, necessitating in the case of an infertile wife, the introduction of a birth mother whom the law cloaks with superior protection. Given the State's valid interest in making identification of the father easier when the child is born during the marriage for child support purposes, Fazilat, supra, 180 N.J. at 87, 848 A.2d 761, and its equally sound interest in requiring more than a shared intent before effectuating a legal change in the parental relationship between adult and child, the distinctions drawn by the Legislature in the Parentage Act are not without a rational basis and therefore pass constitutional muster.
Lastly, we summarily reject plaintiffs' contention that the State Registrar need not have been served with notice of their application nor afforded an opportunity to respond. Suffice it to say, in order for the State Registrar to discharge her duty of ensuring the integrity of vital records, which includes the accurate registration *399 of all relevant statistics relative to a birth that occurs in New Jersey "in accordance with law," N.J.S.A. 26:8-25(e), she is entitled to receive notice of a court application that seeks to render the birth certificate a parentage finding in the absence of explicit statutory authorization and be afforded the opportunity to respond. See N.J.S.A. 26:8-1; N.J.S.A. 26:8-24; see also R. 4:28-1. While it may not be necessary to formally join the State Registrar as a party, the elemental requirements of notice and an opportunity to be heard adequately protect her interest in ensuring that birth certificates are made and recorded consistent with the law.
Affirmed.
NOTES
[1] As distinguished from "artificial insemination," which involves "the introduction of semen into the female reproductive organs without sexual contact," Webster's II New College Dictionary 64 (1995), in vitro fertilization is "the procedure whereby an egg is fertilized by sperm outside of a woman's body and the resulting embryo is then implanted into a woman's uterus for gestation." Stedman's Medical Dictionary 573 (25th ed. 1990). Surrogacy, the substitution of one in bringing a pregnancy to term for another unable to become pregnant, may be of two types: traditional, where the surrogate's egg is fertilized by artificial insemination and the surrogate therefore bears a genetic relation to the child she carries; and gestational, where no such relationship exists. Charles P. Kindregan, Jr. & Maureen McBrien, Assisted Reproductive Technology: A Lawyer's Guide to Emerging Law and Science 129-132 (ABA Publishing 2006).
[2] While the State's motion was pending, the hospital where the child was born submitted a birth certificate form to the Bureau listing A.L.S. and T.J.S. as the parents. As a result, a birth certificate was issued for the child listing A.L.S. as the mother, even though the Bureau had advised against it. The State decided, nevertheless, to proceed with its motion and represented that, prior to final adjudication, it would seal the existing birth certificate and issue a new one listing T.J.S. as the father, but leaving the mother blank, and would then issue a third birth certificate following and in accordance with the court's final ruling in the matter. We understand this arrangement was extended through appellate resolution.
[3] Enactment of the Parentage Act was simultaneously accompanied by repeal of the 1929 legislation governing what were known as "bastardy proceedings," N.J.S.A. 9:16-1 to -4. Common law imposed no legal obligation on the putative father to support an illegitimate child under the doctrine of nullius filius. Borawick v. Barba, 7 N.J. 393, 400, 81 A.2d 766 (1951). By repealing the 1929 legislation, the 1983 statutory enactment erased the prior unequal treatment of children born out of wedlock.
[4] The natural mother of a child is established by proof of her having given birth to the child or under the Act. N.J.S.A. 9:17-41(a). The natural father is established by various methods, including prior paternity adjudication, execution of a Certificate of Parentage, default judgment, order of the court, or scientific testing. N.J.S.A. 9:17-41(b).
[5] A man is also presumed to be the biological father of a child where "[h]e acknowledges his paternity of the child in a writing filed with the local registrar of vital statistics, which shall promptly inform the mother of the filing of the acknowledgment, and she does not dispute the acknowledgment within a reasonable time after being informed thereof, in a writing filed with the local registrar." N.J.S.A. 9:17-43(a)(6).
[6] Under N.J.S.A. 9:17-44(b), unless the parties agree to the contrary, the sperm donor "is treated in law as if he were not the father of a child thereby conceived and shall have no rights or duties stemming from the conception of a child."
[7] Adoption establishes the "same relationships, rights, and responsibilities between the child and the adopting parent as if the child were born to the adopting parent in lawful wedlock." N.J.S.A. 9:3-50(b). Significant for present purposes, however, the wife could not adopt the child until at least seventy-two hours after the birth, which is the period under N.J.S.A. 9:3-41(e) in which the birthing mother or gestational carrier may assert her rights to the child.
[8] Our courts have already addressed the scenario where the wife is biologically related to the child carried to term by a gestational surrogate. In A.H.W. v. G.H.B., a married couple arranged, without financial compensation, for the wife's sister to serve as a gestational surrogate, carrying the couple's embryo to term since the wife was unable to do so. 339 N.J.Super. 495, 497, 772 A.2d 948 (Ch. Div.2000). Prior to the birth, the couple filed a complaint with the Family Part, seeking a pre-birth order establishing them as the legal mother and father of the baby at the time of birth, and placing their names on the child's birth certificate. Ibid. The court found that a pre-birth order establishing parentage at birth was contrary to N.J.S.A. 9:3-41(e), which prohibits surrender of a birth mother's rights until seventy-two hours after birth. Id. at 504, 772 A.2d 948. The court, however, noted that a birth certificate can be issued and filed up to five days after the birth pursuant to N.J.S.A. 26:8-28(a). Ibid. Therefore, the court's solution was to order issuance of the birth certificate four days after the birth, which would accommodate the surrogate's statutory seventy-two hour waiting period in which to exercise her rights and also allow the birth certificate with the intended parents' names to be issued within the requisite five days of birth. Id. at 505, 772 A.2d 948.
[9] As noted, the exceptionwhere a woman does not give birth to a child but is still biologically related to the child through contribution of genetic materialhas already been addressed in A.H.W., supra. As previously discussed, the A.H.W. court devised a solution for this specific factual scenario that provides relief for the intended parents while still conforming to statutory mandates and protecting the interests of all parties.

Because A.L.S. in this case has no biological connection to the child, we need not address the question of whether the constitutional guarantee of equal protection is violated by a State policy that allows the genetic father, but not the genetic mother, to be listed on the birth certificate of a child born to a gestational carrier. See, e.g., J.R. v. Utah, 261 F.Supp.2d 1268, 1294 (D.Utah 2003) (concluding that the application of the Utah statute deeming the surrogate the legal mother violates the Fourteenth Amendment's equal protection guarantee because it allows the genetic father, but not the genetic mother, to be listed on the birth certificate of a child born to a gestational surrogate); Soos v. Superior Court, 182 Ariz. 470, 897 P.2d 1356, 1361 (App.1994) (holding that an Arizona statute that permitted a genetic father to prove paternity, but did not allow a genetic mother to prove maternity, and instead automatically granted a gestational carrier the status of legal mother, violated the Fourteenth Amendment's Equal Protection Clause); Culliton v. Beth Israel Deaconess Med. Ctr., 435 Mass. 285, 756 N.E.2d 1133, 1141 (2001) (entering a parentage order deeming the genetic parents the legal parents of twins carried by a gestational surrogate). Cf. In re Roberto d.B., 399 Md. 267, 923 A.2d 115, 125 (2007) (relying on the state equal rights amendment to hold that courts must interpret Maryland's paternity statute, which allows men to rebut paternity based on evidence of the lack of a genetic relationship, to apply equally to women).
[10] In fact, Section 44(b) provides the only instance where a genetic contributor has no rights and duties stemming from the conception and birth of a child. N.J.S.A. 9:17-44(b).
[11] We do not read In re Robinson, 383 N.J.Super. 165, 890 A.2d 1036 (Ch.Div.2005), as suggesting to the contrary and thus plaintiffs' reliance thereon is misplaced. In Robinson, the court, relying on Section 44 and the umbrella of the "best interest of the child" standard, declared the non-biological same sex domestic partner of a woman who gave birth through artificial insemination to be the other parent of the child without requiring adoption, thus affording her the statutory presumption of parenthood afforded to husbands. Id. at 175-76, 890 A.2d 1036.

Contrary to plaintiffs' contention, Robinson is not analogous to the circumstances at hand. Rather, in Robinson, the couple mirrored the situation articulated by the Legislature in the Artificial Insemination Statute, save for the gender of the non-gestational partner. The couple, in a relationship equivalent to marriage, Lewis v. Harris, 188 N.J. 415, 908 A.2d 196 (2006), was unable to have a child through "traditional" means. Accordingly, the gestational partner was artificially inseminated by the sperm of a donor with the consent of her partner. The resulting child was thus biologically related to the gestational partner. Most important to the present circumstances, a third-party gestational carrier, and her accompanying rights, were not involved.
Of course, although the "best interest" standard is used for various determinations involving the well-being of a child, it is not a factor in defining parenthood under the Parentage Act. Thus, in our view, the court in Robinson erred by relying upon the "best interest" standard in deciding the issue of parentage. However, we express no view whether the same result could have been reached by a different analysis.
[12] The New Jersey Law Revision Commission (Commission), in noting the need for revision in light of technological advances, has stated:

The current parentage provisions were written in 1983 as a version of the Uniform Parentage Act. There were amendments in 1994, 1997 and 1998. No one is very happy with the current statute. It does not fully reflect modern ability to make clear scientific decisions as to genetic parentage. [Memorandum from John M. Cannel, Executive Director, New Jersey Law Revision Commission, on Title 9 Children (Mar. 10, 2008).]
In fact, in its 2010 Final Report, the Commission recommended a gender-neutral revision to Section 44, broadening the artificial insemination provision to include donations of both eggs and sperm. The Commission thus proposes in relevant part:
a. If, under the supervision of a licensed physician and with the consent of both parties to a marriage, civil union or domestic partnership, pregnancy is achieved with semen, an egg or both, donated by persons not parties to the marriage, the parties to the marriage shall be the parents of the resulting child irrespective of genetic parentage.
[New Jersey Law Revision Commission, Final Report Relating to Title 9Parentage, Apr. 15, 2010.]
To date, the Legislature has not enacted this proposal. Compare, e.g., Ala.Code § 26-17-702 (LexisNexis 2008) ("A donor who donates to a licensed physician for use by a married woman is not a parent of a child conceived by means of assisted reproduction. A married couple who, under the supervision of a licensed physician, engage in assisted reproduction through use of donated eggs, sperm, or both, will be treated at law as if they are the sole natural and legal parents of a child conceived thereby."); N.C. Gen.Stat. § 49A-1 (2003) ("Any child or children born as the result of heterologous artificial insemination shall be considered at law in all respects the same as a naturally conceived legitimate child of the husband and wife requesting and consenting in writing to the use of such technique."); Okla. Stat. Ann. tit. 10, § 552 (West 2007) ("Any child or children born as the result [of artificial insemination] shall be considered at law in all respects the same as a naturally conceived legitimate child of the husband and wife so requesting and consenting to the use of such technique.").