54 A.3d 263

IN THE MATTER OF THE PARENTAGE OF
A CHILD BY T.J.S. AND A.L.S., H/W.

Argued March 1, 2012—Decided October 24, 2012.

*Donald C. Cofsky* argued the cause for appellants T.J.S. and A.L.S. (*Cofsky & Zeidman,* attorneys; *Mr. Cofsky* and *Pasquale Guglietta,* on the briefs).

*Kimberly E. Jenkins,* Deputy Attorney General, argued the cause for respondent Department of Health and Senior Services, Bureau of Vital Statistics and Registration (*Jeffrey S. Chiesa,* Attorney General of New Jersey, attorney; *Melissa H. Raksa,* Assistant Attorney General, of counsel).

PER CURIAM.

The judgment of the Appellate Division, reported at 419 *N.J.Super.* 46, 16 *A.*3d 386 (2011), is affirmed by an equally divided Court.

Justice HOENS, concurring.

Plaintiffs T.J.S. and A.L.S. are a married couple who have been unable to have a child together because A.L.S. is not able to carry a pregnancy to term. Desirous of having a child, the couple decided that T.J.S. would contribute sperm that would be used to fertilize the ovum of an anonymous donor. They then entered into an agreement with A.F., a woman who is not related to either of the plaintiffs or to the anonymous donor of the ovum. They assert that, pursuant to that agreement, A.F. consented to have the resulting embryo implanted into her uterus. A.F. carried that pregnancy to term and gave birth to a child in July 2009.

Shortly prior to and in anticipation of the expected birth, plaintiffs sought an order from the Superior Court that would direct that the child's birth certificate identify A.L.S. as the child's mother. Plaintiffs' complaint averred that they were proceeding in reliance on a published decision, *A.H.W. v. G.H.B.,* 339 *N.J.Super.* 495, 772 *A.*2d 948 (Ch.Div.2000), in which a similar request had been approved, and that they intended to follow the mechanism that had been utilized in that proceeding. A few days later, the trial court entered the order, which was not opposed, in the form that plaintiffs had requested.

After a birth certificate that complied with the court's order was issued, the Department of Health and Human Services, Bureau of Vital Statistics filed a motion seeking to have the court vacate its order. The Department, which had not been afforded notice of plaintiffs' application, contended that there was no basis in the applicable statutes for the relief that plaintiffs had requested from the court.

The trial court, after considering the arguments raised on behalf of the plaintiffs and the Department, granted the Department's application and vacated the order that had been entered prior to the child's birth. The Appellate Division affirmed that judgment, rejecting both the statutory and constitutional arguments that plaintiffs advanced on appeal. *In re Parentage of T.J.S.*, 419 *N.J.Super.* 46, 16 *A.*3d 386 (App.Div.2011).

I would affirm the judgment of the Appellate Division, largely for the reasons that have been so thoroughly and cogently set forth in the opinion that Judge Parrillo authored on behalf of that court. In particular, I concur in his analysis of the plain language of the Parentage Act, *N.J.S.A.* 9:17–38 to –59, and in his persuasive argument that its presumption of paternity cannot be understood or interpreted to create a presumption of maternity. *In re Parentage of T.J.S., supra,* 419 *N.J.Super.* at 54–55, 16 *A.*3d 386. As the plain language of the statute provides, the status of maternity is grounded on either a biological or genetic connection to the child, *N.J.S.A.* 9:17–41(a), failing which the Legislature has decreed that the status can only be achieved through adoption, *see N.J.S.A.* 9:17–41(c).

Moreover, I concur in Judge Parrillo's analysis of the equal protection challenge and his observation that a gender-based differentiation, like the one found in the Parentage Act, may withstand a constitutional attack if the difference is one grounded in an actual physiological distinction between men and women. *In re Parentage of T.J.S., supra,* 419 *N.J.Super.* at 58–59, 16 *A.*3d 386. As Judge Parrillo observed, the Legislature has devised a statutory means through which A.L.S. may, promptly and effi-

ciently, be declared to be the child's mother, and her desire to create a more expedient method that will effectuate her intent does not represent a fundamental right nor one of constitutional magnitude. *Id.* at 57, 16 *A.*3d 386.

Finally, I concur in the Appellate Division's reasoning that the absence of a statutory response to this Court's rejection of the equal protection challenge to the Parentage Act in the context of a surrogacy contract, *see In re Baby M.,* 109 *N.J.* 396, 537 *A.*2d 1227 (1988), demonstrates the preference of the Legislature to "proceed incrementally in addressing the parentage issues presented by one form of reproductive procedure without addressing those raised by other new reproductive procedures," *In re Parentage of T.J.S., supra,* 419 *N.J.Super.* at 65, 16 *A.*3d 386.

In addition, however, to the thorough and scholarly discussion of these difficult and important questions set forth in Judge Parrillo's opinion, the arguments advanced by plaintiffs before this Court raise further questions, each of which calls for a response.

First, the heart of plaintiffs' attack on the Parentage Act is a constitutional one, resting on their assertion that unless the statutory provisions can be applied in a gender-neutral fashion, they cannot be sustained. It is a well-established principle of our jurisprudence that we indulge in "every possible presumption [that] favors the validity of an act of the Legislature." *N.J. Sports & Exposition Auth. v. McCrane,* 61 *N.J.* 1, 8, 292 *A.*2d 545, *appeal dismissed sub nom. Borough of E. Rutherford v. N.J. Sports & Exposition Auth.,* 409 *U.S.* 943, 93 *S.Ct.* 270, 34 *L.Ed.*2d 215 (1972). We do not, therefore, "declare void legislation unless its repugnancy to the Constitution is clear beyond a reasonable doubt." *In re P.L. 2001, Chapter 362,* 186 *N.J.* 368, 392, 895 *A.*2d 1128 (2006). On the contrary, we strive to interpret statutes so as to avoid, if at all possible, an interpretation that would render the pronouncement of the Legislature unconstitutional. *In re Village of Loch Arbour,* 25 *N.J.* 258, 264–65, 135 *A.*2d 663 (1957) ("[I]f [a] statute under [constitutional] attack admits of two constructions,

one of which will render it invalid and the other valid, the interpretation sustaining constitutionality will be adopted.").

Viewed against this clear principle of statutory construction, the constitutional challenge to the Parentage Act can only succeed if there is no way to construe the statute so as to preserve its constitutionality. As a result, if one recognizes that the Legislature could, and did, base its distinction between presumptive rights of men and women on the realities of our physiological differences, then those distinctions can and must survive a constitutional attack. That is, if the Legislature, in enacting the Parentage Act, and in creating its gender-based differences relating to presumptive parentage, made those choices in accordance with actual differences, then there is no violation of our Constitution's guarantee of equal protection. *See Lewis v. Harris,* 188 *N.J.* 415, 442, 908 *A.*2d 196 (2006) (interpreting New Jersey Constitution's expansive language to include equal protection guarantee); *Greenberg v. Kimmelman,* 99 *N.J.* 552, 568, 494 *A.*2d 294 (1985) (same).

As we have previously held, "the right to equal protection does not require us to scrutinize gender distinctions that are based on real physiological differences to the same extent we would scrutinize those distinctions when they are based on archaic, invidious stereotypes about men and women." *State v. Chun,* 194 *N.J.* 54, 103, 943 *A.*2d 114 (2008). As in *Chun,* in advancing the interests of equal protection, we cannot "demand that things that are different in fact be treated the same in law, nor that a state pretend that there are no physiological differences between men and women," *ibid.,* when indeed there are. The Parentage Act, in resting maternity on biology or genetics, makes plain that the child who is at the center of this appeal is genetically the child of the anonymous ovum donor and biologically the child of A.F., who carried the child to term and gave birth. Nothing in that distinction offends equal protection; certainly nothing in that distinction deprives A.L.S. of any recognized right.

Indeed, it is only by accepting the decision-making framework urged upon us by plaintiffs that one can step into the constitution-

al analysis. Plaintiffs would have this Court look at them not as one man and one woman, but as an infertile couple. Moreover, they demand that the analysis equate for all purposes infertile men and infertile women, reasoning that if the former have a statutory right, the latter must have the same right. Thus, by redefining themselves as infertile people, they assert that they have attained a status of equivalence that supports their equal protection challenge. In so positing, however, they ignore this Court's recognition that the process of gestation and birth, for an infertile couple, necessarily involves another person. *See In re Baby M., supra,* 109 *N.J.* at 450, 537 *A.*2d 1227 (observing that "[i]t is quite obvious that the situations [as between infertile husbands and wives for equal protection purposes] are not parallel"). More to the point, by redefining their status, plaintiffs seek to avoid the plain and unavoidable biological fact that their child is biologically related to A.F., to whom the Legislature has afforded statutory rights and to whom the Constitution likewise grants protection. Those rights, addressed through the adoption statute's protection for birth mothers, are rights given to A.F. that in no way interfere with any right of A.L.S. Indeed, what A.L.S. desires is the creation of a status contrary to the protections of the adoption statute simply to avoid complying with the time-honored adoption process. Convenience and desire by litigants, however, cannot supplant the clear legislative preference or the constitutional commands that are based on the biological connection between A.F. and the child.

We need not comment on the opinion of the trial court in *A.H.W.,* which created, in somewhat different circumstances, the mechanism that plaintiffs sought to use in their effort to have a birth certificate issued that would identify A.L.S. as the mother of the child. That mechanism sought to comply with the adoption statute by causing the issuance of the birth certificate to be delayed until the end of the waiting period required by the adoption statute for the relinquishment of parental rights. *N.J.S.A.* 9:3–41(e) (imposing seventy-two hour waiting period following birth before parent may execute surrender of parental

rights). Although that mechanism, presuming that A.F. in fact waived her rights as anticipated, would comply with that particular requirement of the adoption statute, it would effectively replace adoption, the Legislature's method for creating the legal relationship between A.L.S. and the child, with a more convenient method of plaintiffs' choosing.

I do not doubt plaintiffs' sincerity in their effort to effectuate their intention that both of them be acknowledged as the parents of the child from the earliest possible moment. Their effort, however, is one that should be addressed in the first instance to the Legislature, rather than to the courts. That remains as true today as when the appellate panel rejected plaintiffs' arguments. Although the Legislature passed a bill that would have created an exception to the adoption statute for couples like plaintiffs, *see S.* 1599, 215th Leg. (N.J.2012) (introduced Feb. 13, 2012; passed by Senate as amended May 31, 2012); *A.* 2646, 215th Leg. (N.J.2012) (introduced Mar. 8, 2012; amended June 21, 2012), that bill was vetoed by the Governor, in part because of what he considered to be insufficient study of the larger social questions that are implicated by the bill that was passed, *see Governor's Veto Message to S. Bill No. 1599* (Aug. 9, 2012). The divergent positions taken by the legislative and executive branches heighten rather than diminish the need for this Court to stay its hand; plaintiffs' lack of success to date in achieving a statutory solution hardly entitles them to the creation of a constitutional right.

For me, there are four reasons why it is the province of the other branches of government to address the arguments that plaintiffs have raised.

First, the choice about how to balance the rights of the parties, including not only the rights of infertile men and women, but of the women who assist them through carrying children to term and giving birth, is uniquely suited, in the first instance, to the Legislature, which is ordinarily the body vested with making decisions about such important social policies as this.

Second, we have before us a record too sparse to serve as the basis for making such a choice. Rather than the sort of record that would permit a careful weighing and balancing of all of the rights of all of the participants, the record before this Court consists of only the stated intention and desire of plaintiffs, a clinical description of the means by which the pregnancy was accomplished, a few vague references to plaintiffs' otherwise secret "arrangement" or "agreement" with A.F., and a document through which A.F. waived her right to counsel and relinquished her parental rights to the child she bore. Notwithstanding the elaborate descriptions of the facts set forth in the dissent, *see post* at 350–51, 360–61, 54 *A.*3d at 272–73, 278–79, there is nothing at all in this record that supports the dissent's assertions about the terms of the "agreement" with A.F.

If we permit the thin factual showing to serve as the basis for declaring that one party to the "arrangement" has a constitutional right and the other has none, we do so oblivious to the much larger social implications of that choice. We do so by effectively stripping the participant who currently has a constitutionally recognized fundamental right to parent, in this case the biological mother A.F., *see Stanley v. Illinois,* 405 *U.S.* 645, 651, 92 *S.Ct.* 1208, 1212, 31 *L.Ed.*2d 551, 558 (1972); *N.J. Div. of Youth & Family Servs. v. A.W.,* 103 *N.J.* 591, 599, 512 *A.*2d 438 (1986), of that right with no clue about why she made that choice and, more importantly, without even considering whether there should be safeguards or protections in place to ensure that her choice is indeed a knowing and voluntary one, as befits the waiver of any constitutional right, *see, e.g., Miranda v. Arizona,* 384 *U.S.* 436, 478–79, 86 *S.Ct.* 1602, 1630, 16 *L.Ed.*2d 694, 726 (1966) (holding that procedural safeguards must be employed to protect privilege against self-incrimination); *Aetna Ins. Co. v. Kennedy,* 301 *U.S.* 389, 393–94, 57 *S.Ct.* 809, 811–12, 81 *L.Ed.* 1177, 1180–81 (1937) (noting that fundamental right to jury trial cannot be waived knowingly by mere assertion of request for directed verdict); *State v. Crisafi,* 128 *N.J.* 499, 510, 608 *A.*2d 317 (1992) (citing *Patterson v. Illinois,* 487 *U.S.* 285, 298, 108 *S.Ct.* 2389, 2398, 101

*L.Ed.*2d 261, 276 (1988) (noting that rigorous procedures must be observed before permitting waiver of right to counsel at trial)); *State v. Bey*, 112 *N.J.* 45, 66, 548 *A.*2d 846 (1988) (requiring that right to remain silent be scrupulously honored).

Our dissenting colleagues insist that there is no conflict between the constitutional right that they would create for A.L.S. and the well-established constitutional right enjoyed by A.F. because the record includes A.F.'s statement that her decision to relinquish her parental rights was voluntary. *Post* at 361, 54 *A.*3d at 279. That reasoning, however, avoids the issue we have considered because it effectively would eliminate the constitutional rights of the entire class of women who might become gestational surrogates merely because this particular individual was willing to waive those rights. It is our concern for the entire class of women who might be affected, rather than the dissent's narrow focus on the individual whose right was affected in this matter, that compels the conclusion we have reached. Indeed, were we to issue the broad, equal-protection based pronouncements called for in the dissent, we would create a virtually unregulated right to sidestep all of the protections now vested in a biological mother and would effectively protect "arrangements" unfettered by any standards at all.

Third, if this Court, based on the truncated record presented in this appeal, announces that there is some fundamental constitutional right enjoyed by A.L.S. to be identified on the child's birth certificate in the fashion that plaintiffs have chosen, our very act of so deciding will wrest from the Legislature the flexibility that it needs to fairly evaluate and carefully balance the far larger universe of participants and rights involved. Such a foray into uncharted waters is imprudent and threatens to hamstring that legislative process as it moves forward.

Finally, were we to determine that A.L.S. has a right of constitutional magnitude, it seems to me that we would create a true equal protection violation. By vesting this particular plaintiff with a constitutional right, we would be elevating one class of

infertile people who seek to address infertility, and whose rights could be accomplished through adoption, above all other infertile people and all other adopters. The mechanism that would be created would comply with the adoption statute only to the extent of bowing to the seventy-two hour waiting period that the Legislature has fixed as the time before which no birth mother may relinquish the right to her child, but would otherwise relieve plaintiffs who have the ability and the wherewithal to enter into an agreement with a willing participant from the strictures of the adoption statute. It would elevate some people, who would otherwise be required to adopt, above all other adopters, based solely on their ability to access and afford new technology, thus, at least potentially, creating an unconstitutional distinction among infertile people as a class.

In the end, this dispute represents a social policy choice, and one that requires careful consideration of the rights not only of plaintiffs who have appeared and who have the resources to be able to access this advance in medical technology, but of the women, like A.F., who may be selected to assist them at the expense of sacrificing the constitutional rights that go along with being the biological parent of the child being born, and of all others who would equally wish to have a child and are required to resort to adoption. It requires a careful consideration of all of these important rights and it demands delicate balancing of the rights of these parties, of others not before this Court and of larger social issues that are appropriately the province of the other branches of government and not of the courts, save only for our intervention should the choice made tread on other constitutional protections. In the end, the question is not a constitutional one, but one that should be addressed, if at all, by the other branches of government, informed by a thorough and public debate of these profound and significant questions.

I therefore concur in the judgment of the Appellate Division and I would affirm that judgment.

Justice ALBIN, dissenting.

This case is about the unequal treatment of similarly situated infertile married women and infertile married men under the law. The New Jersey Parentage Act (Parentage Act), *N.J.S.A.* 9:17–38 to –59, confers on an infertile married man the right to become the natural father of a child who is conceived when his wife is artificially inseminated with the sperm of another man. *N.J.S.A.* 9:17–44. Although the man has no genetic connection to the child, the law allows him to have his name placed on the birth certificate as the natural father and to avoid the cost and delay involved in adoption. *See N.J.S.A.* 9:17–44(a); *N.J.A.C.* 8:2–1.5(b).

However, the law does not provide a comparable right to an infertile married woman. *See N.J.S.A.* 9:17–44(a); *N.J.A.C.* 8:2–1.5(b). In the case before us, a married woman who could not carry a child to term turned to assisted-reproductive technology. She and her husband arranged to have the husband's sperm fertilize anonymous eggs through in vitro fertilization and then to have the embryos implanted in a gestational surrogate willing to bear the child for the couple. The surrogate, three days after the birth of the child, knowingly and voluntarily relinquished her parental rights. Unlike the infertile husband, this infertile wife has no right to have her name placed on the birth certificate as the natural mother under the Parentage Act and is burdened by the cost and delay of adoption.

This case is not about the propriety of in vitro fertilization or gestational surrogacy. The Parentage Act does not prohibit the use of gestational surrogates. No one has claimed that the surrogacy arrangement was procured through improper means or that the surrogate has not given a willing and informed consent. The only question is whether, in the circumstances of this case, our State Constitution requires that the infertile wife be treated equally—that her name be placed on the birth certificate as the natural mother as would happen if she were an infertile husband under *N.J.S.A.* 9:17–44(a).

A legal scheme that treats differently those who should be treated alike violates the equal-protection guarantee of Article I, Paragraph 1 of the New Jersey Constitution. Despite the obvious anatomical and physiological differences between the infertile husband and wife, once a surrogate knowingly and voluntarily surrenders her parental rights, their situations are not meaningfully different. Denying the infertile wife and her intended child, as here, the same benefits and privileges given to her male counterpart and his intended child bears no substantial relationship to a legitimate governmental purpose and abridges her right to the equal protection of the laws.

Because three members of the Court disagree, as a six-person Court, we are evenly divided on this issue. The result of this impasse is that the judgment of the Appellate Division, which denied the infertile wife her equal-protection rights, will be affirmed. Accordingly, I respectfully dissent.

## I.

Today, it is not uncommon for couples unable to conceive a child to turn to assisted-reproductive technology.[1] The promise of this new technology, to be sure, comes with the potential for its abuse. The State unquestionably is empowered to regulate this area of human affairs.[2] Its failure to do so to date is not an issue in this

---

[1] *See* Emily Gelmann, *"I'm Just the Oven, It's Totally Their Bun"*: *The Power and Necessity of the Federal Government to Regulate Commercial Gestational Surrogacy Arrangements and Protect the Legal Rights of Intended Parents*, 32 *Women's Rts. L. Rep.* 159, 160 (2011).

[2] The Legislature passed a bill that would have permitted, under highly regulated conditions, pre-birth orders naming the intended parents as the sole legal parents of a child conceived through gestational surrogacy. *See S.* 1599, 215th Leg. (N.J.2012) (introduced Feb. 13, 2012; passed by Senate as amended May 31, 2012); *A.* 2646, 215th Leg. (N.J.2012) (introduced Mar. 8, 2012; passed by Assembly as June 21, 2012). The "New Jersey Gestational Carrier Agreement Act" would have mandated various regulatory safeguards, including the requirements that gestational carriers "be at least 21 years of age, have given birth to at least one child, have completed medical and psychological evaluations[,] . . . and

case. The issue that confronts the Court is about gender equality, about the disparate treatment of married women and married men.

The question is whether the Legislature, by statute, can confer a right on an infertile husband—to be declared the natural father of a child with whom he has no genetic connection—and deny the same right to a similarly situated infertile wife. My review of the facts and procedural history is limited to shedding light on this issue.

## A.

The essential facts are not in dispute.[3] Plaintiffs T.J.S. and A.L.S. are married, and A.L.S. is unable to carry a child to term. In 2008, the couple turned to the process of in vitro fertilization.[4] In a clinic, T.J.S.'s sperm was used to fertilize the ova of an anonymous donor, who had relinquished her legal rights to the eggs. Two embryos were then implanted into the uterus of A.F., who had agreed to serve as a gestational surrogate for A.L.S.[5]

---

have retained an attorney independent of the intended parent." S. Health, Human Servs. & Senior Citizens Comm., *Statement to S. Bill No. 1599* (May 17, 2012). The Governor vetoed this bill. *Governor's Veto Message to S. Bill No. 1599* (Aug. 9, 2012) (explaining that Legislature had not "sufficiently studied" "serious and significant issues" concerning gestational surrogacy). Gestational surrogacy, for the most part, remains an unregulated area. *See In re Baby M.*, 109 *N.J.* 396, 411, 537 *A.2d* 1227 (1988) (placing certain limitations on surrogacy agreements).

[3] Despite the concurrence's suggestion to the contrary, the facts presented here are based on the record—indeed, they are based on the unchallenged, sworn statements of A.L.S., T.J.S., and A.F.

[4] In vitro fertilization is an assisted-reproductive procedure that involves the fertilization of an egg by sperm outside of a woman's body. Marsha Garrison, *Law Making for Baby Making: An Interpretive Approach to the Determination of Legal Parentage*, 113 *Harv. L.Rev.* 835, 848–49 (2000). To effectuate pregnancy, the resulting embryo is implanted into a woman's uterus. *See id.* at 848.

[5] In a "traditional surrogacy" arrangement, the "surrogate serves as both the genetic and the gestational mother to a child." Darra L. Hofman, *Mama's Baby,*

A.F. has no genetic connection to the child and has never asserted any legal right to the child.

A.F. averred in a certification that she intended only to carry the child to term for plaintiffs who would then become the sole parents of any child born. Under the surrogacy agreement, however, A.F. did not relinquish her rights in advance of the child's birth. She had two options. Seventy-two hours after the birth of the child, A.F. could surrender all parental rights to the child, allowing T.J.S. and A.L.S. to be listed as the child's birth parents.[6] *See N.J.S.A.* 9:3–41(e). Or, at any time after the birth of the child and before relinquishing parental rights, she could assert a claim to the child.

In light of the surrogacy agreement, and with the consent of A.F., plaintiffs filed a pre-birth complaint in the Chancery Division, Family Part in Camden County seeking an order requiring that their names be printed on the child's birth certificate "as the biological parents of the child" *after* A.F. relinquished any parental rights. A.F. could not surrender those rights until the completion of a seventy-two-hour waiting period following the birth of the child. *See N.J.S.A.* 9:3–41(e). The court issued a pre-birth order on July 2, 2009 granting plaintiffs' request contingent upon A.F.'s relinquishment of parental rights pursuant to *N.J.S.A.* 9:3–41(e).[7]

On July 7, 2009, A.F. gave birth to T.D.S., a child genetically related to T.J.S. and the anonymous egg donor. Three days later,

---

*Daddy's Maybe: A State–by–State Survey of Surrogacy Laws and Their Disparate Gender Impact*, 35 *Wm. Mitchell L.Rev.* 449, 451 (2009). The surrogate in a "gestational surrogacy," however, "serves solely as the gestational mother." *Ibid.* The child may be genetically related to both intended parents, only one intended parent, or neither intended parent. *See ibid.*

[6] One way for a child to be eligible for adoption is if the mother surrenders her parental rights to the child. *See N.J.S.A.* 9:3–41(a). A surrender that occurs earlier than seventy-two hours after "the birth of the child" is not valid. *N.J.S.A.* 9:3–41(e).

[7] The court also required that all documents pertaining to the case be sealed in accordance with adoption law, *N.J.S.A.* 9:3–52.

by affidavit, A.F. surrendered all legal rights to the child to plaintiffs. Later, a birth certificate was issued listing T.J.S. and A.L.S. as the child's parents.

B.

The Department of Health and Senior Services, Bureau of Vital Statistics and Registration (State) did not have notice of plaintiffs' application for a pre-birth order. The State moved to vacate the order allowing A.L.S. to be listed as the mother on the birth certificate.[8] The trial court granted the State's motion and vacated its previous order.

Although the court rejected plaintiffs' statutory and constitutional arguments, it recognized that the issuance of the pre-birth order in this case was not a novel procedure and had been approved by the Camden Vicinage and followed in other counties. *See A.H.W. v. G.H.B.*, 339 *N.J.Super.* 495, 772 *A.*2d 948 (Ch.Div. 2000).[9] The court determined that the pre-birth order conferred on A.L.S. parental rights not granted by either the New Jersey Parentage Act, *N.J.S.A.* 9:17–38 to –59, generally, or the Artificial Insemination Statute, *N.J.S.A.* 9:17–44, specifically. The court also concluded that not allowing A.L.S.'s name to be placed on the

---

[8] While its motion was pending, the State sealed the original birth certificate and issued a new one listing T.J.S. as the father but leaving blank the mother's name.

[9] In *A.H.W.*, the Bergen County Chancery court allowed an intended mother's name to be listed on the birth certificate after the gestational surrogate relinquished her parental rights. 339 *N.J.Super.* at 505–06, 772 *A.*2d 948. The court issued a pre-birth order directing an attending physician, who was to deliver a child conceived through gestational surrogacy, to "prepare a Certificate of Parentage four days after the birth of the child," listing the names of the intended parents as the child's legal parents. *Ibid.* If the surrogate, after a seventy-two-hour waiting period, surrendered her parental rights, the birth certificate was "to be issued within five days of birth." *Id.* at 505, 772 *A.*2d 948. In the event that the surrogate "change[d] her mind once the baby [was] born, she [would] have a chance to litigate for parental rights to the child." *Id.* at 505, 772 *A.*2d 948. The Attorney General, who was a party to the action, did not appeal.

birth certificate did not deny her the equal protection of the laws as guaranteed by Article I, Paragraph 1 of the New Jersey Constitution.

## C.

The Appellate Division affirmed, finding, among other things, that our State Constitution's equal-protection guarantee did not require that an infertile wife be given the same benefits conferred on the infertile husband under the Artificial Insemination Statute, *N.J.S.A.* 9:17–44. *In re Parentage of a Child by T.J.S.*, 419 *N.J.Super.* 46, 62–67, 16 *A.*3d 386 (App.Div.2011). The Appellate Division held that the Parentage Act does not violate the equal-protection rights of A.L.S. because the "situations [of infertile men and women] are not parallel and the Legislature is entitled to take these situational differences into account in defining additional means of creating parenthood." *Id.* at 67, 16 *A.*3d 386.

The panel posited that A.L.S. is not similarly situated to the infertile man because "the surrogate mother whose parental rights are deemed worthy of protection ... stand in the way of the infertile wife's claim to automatic motherhood." *Id.* at 63, 16 *A.*3d 386. It is "the introduction of a birth mother whom the law cloaks with superior protection" that differentiates the case of A.L.S. and the infertile husband granted parental rights under the Artificial Insemination Statute. *Id.* at 67, 16 *A.*3d 386. By this reasoning, the "disparate treatment is not grounded in gendered constructions of parenthood but in actual reproductive and biological differences." *Ibid.* The panel concluded its equal-protection analysis by stating that the distinctions between the infertile wife, such as A.L.S., and the infertile husband are rationally based on account of "the State's valid interest in making identification of the father easier when the child is born during the marriage for child support purposes and its equally sound interest in requiring more than a shared intent before effectuating a legal change in the parental relationship between adult and child." *Ibid.* (internal citation omitted).

## II.

This case is not about a hypothetical plaintiff or a hypothetical situation. Fictional scenarios or simplistic generalizations about infertile women and surrogacy arrangements should not drive the constitutional analysis in this case. Let us begin by dispelling some of the misconceptions that led the Appellate Division to conclude that A.L.S., an infertile wife, is not similarly situated to an infertile husband who receives the benefit of natural fatherhood under the Artificial Insemination Statute.

This is what we know from the record. The surrogate, A.F., retained the ability either to assert or surrender her parental rights to the child. Before relinquishing custody of T.D.S. to plaintiffs, she was fully informed of her rights. A.F. averred in a certification that (1) "[a]t no time did [she] ever intend to be the legal parent of [T.D.S.] nor in any way be responsible for this child or have any relationship with the child"; (2) she is "not the genetic mother of [T.D.S.], rather, [she] served only as the gestational carrier for the intended parents"; (3) "[a]fter 72 hours [she] signed a relinquishment of any and all parental rights so that the ... intended mother[ ] could be placed on the birth certificate after the Order of Parentage had been signed"; and (4) she does "not wish to be listed on the birth certificate since [she is] not the genetic mother of the child nor [has she] any intention of being the parent of this child." The authenticity and integrity of A.F.'s certification has not been challenged by any of the parties in this case.[10]

---

[10] Whether a gestational surrogate, who has no genetic connection to the child, has a fundamental right to parenthood is not an issue we need to address. Even if A.F., the child's non-genetic birth mother, has a fundamental right to parenthood, as the concurrence contends, she may relinquish those rights consistent with the procedures prescribed by our current adoption laws. *See N.J.S.A.* 9:3–41. She does not have to waive those rights in court—as the concurrence suggests—as if she were a criminal defendant waiving her right to counsel or trial. *See ante* at 340–41, 54 *A.3d* at 267.

Here, the surrogate carrier has relinquished all legal rights to the child—a child with whom she has no genetic connection; no party claims otherwise. The State is not asserting that A.F. could not relinquish her parental rights. Had A.F. not surrendered her parental rights, this would be a different case.

We are not dealing with the concern raised by the Appellate Division-the hypothetical surrogate who "stand[s] in the way of the infertile wife's claim to automatic motherhood." *See id.* at 63, 16 *A.*3d 386. The Appellate Division's conclusion that A.L.S. was not similarly situated to her infertile male counterpart was premised on the objecting surrogate. That premise, however, is a fictional one, not one based on the facts of this case.

### III.

An understanding of the New Jersey Parentage Act, *N.J.S.A.* 9:17–38 to –59, and its differential treatment of an infertile wife and an infertile husband, is necessary to place the equal-protection issue in context.

The Parentage Act serves to advance a number of important societal objectives. It is intended to ensure that "all children and parents have equal rights with respect to each other and to provide a procedure to establish parentage in disputed cases." Sponsor's Statement, *Statement to S. Bill No. 888* (Jan. 19, 1982); *see also* S. Judiciary Comm., *Statement to S. Bill No. 888* (June 21, 1982); *R.A.C. v. P.J.S., Jr.,* 192 *N.J.* 81, 94, 927 *A.*2d 97 (2007). More particularly, the Act—by identifying the means for establishing parentage—guarantees that children will receive the financial support that is rightfully due from their parents. *R.A.C., supra,* 192 *N.J.* at 94, 927 *A.*2d 97; *see also Fazilat v. Feldstein,* 180 *N.J.* 74, 82, 848 *A.*2d 761 (2004) ("The New Jersey Parentage Act helps families deal with the problems posed by fathers who seek to avoid paying child support."). Although the dead-beat dad was clearly a major concern of the Parentage Act, *see R.A.C., supra,* 192 *N.J.* at 94, 927 *A.*2d 97, the legislation allows an action to be brought against any person—including a mother—"for the

purpose of determining the existence ... of the parent and child relationship." *N.J.S.A.* 9:17–45(a).

The "parent and child relationship" is based on "the legal relationship existing between a child and the child's natural or adoptive parents." *N.J.S.A.* 9:17–39. Under the Act, a person is the "natural mother" of a child if she has "given birth to the child." *N.J.S.A.* 9:17–41. By this literal definition, A.L.S. could not be considered the natural mother of T.D.S., even had her own egg been fertilized by her husband's sperm and the resulting embryo transferred to the gestational surrogate.

A person is the "natural father" if his paternity is proven by the methods set forth in *N.J.S.A.* 9:17–41, which includes genetic testing, or is presumed to be the "biological father of a child" if he falls within any one of several statutory categories of *N.J.S.A.* 9:17–43. A man also can establish that he is the natural father of a child—even though he has no biological or genetic connection to the child—through the Artificial Insemination Statute, *N.J.S.A.* 9:17–44. It is this statute that confers a special benefit on an infertile husband and his intended child that is unavailable to an infertile wife and her intended child.[11]

*N.J.S.A.* 9:17–44(a) provides that, when a husband gives his consent, and his "wife is inseminated artificially with semen donated by a man not her husband, the husband is treated in law as if he were the natural father of a child thereby conceived." By the terms of the statute, the semen donor "is treated in law as if he were not the father of [the] child ... and [has] no rights or duties stemming from the conception of [the] child." *N.J.S.A.* 9:17–44(b). In light of modern reproductive technology, the Legislature—by statute—allows an infertile husband to become the natural father of a child, despite having no biological or genetic connection to

---

[11] The Legislature—it is fair to say—could not have envisioned the issue presented in this case when it passed the Artificial Insemination Statute in 1983. *See L.* 1983, *c.* 17, § 7. This country's first reported gestational surrogacy occurred in 1986. *See Test–Tube Baby Born to Surrogate Mother, Miami Herald,* Apr. 17, 1986, at A26.

that child. Clearly, the statute promotes important societal interests, permitting the child to enjoy the immediate benefits of having two parents legally responsible for his or her support while avoiding the expense and delay involved in the adoption process. In the context of this statute, no case suggests that the adoption process is a mere inconvenience. Avoiding that process was one of the obvious goals of the statute.

In contrast, the Parentage Act does not provide any comparable right to an infertile wife who cannot conceive a child or carry one to term, even though (1) a child can be conceived through in vitro fertilization using an anonymous woman's egg and her husband's sperm, (2) a surrogate is willing to carry to term the child with whom she has no genetic connection, and (3) the surrogate has knowingly and voluntarily relinquished any parental right to the child after a seventy-two-hour period following the child's birth. Yet, providing this right to the infertile wife would fulfill all the apparent purposes of the Artificial Insemination Statute. It would ensure that children, shortly after birth, have the emotional and financial security and legal benefits and privileges that come with having two parents. It would give the infertile wife the same privilege accorded to the infertile husband—the right to be declared the natural parent without the delay and the cost of the adoption process.

## IV.

Gender-based statutory classifications " 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' " *Reed v. Reed,* 404 *U.S.* 71, 76, 92 *S.Ct.* 251, 254, 30 *L.Ed.*2d 225, 229 (1971) (quoting *Royster Guano Co. v. Virginia,* 253 *U.S.* 412, 415, 40 *S.Ct.* 560, 561–62, 64 *L.Ed.* 989, 990–91 (1920)). While the inherent physical differences between men and women are immutable characteristics that distinguish the sexes, those differences cannot be used to create "artificial restraints" on individual rights.

*See United States v. Virginia,* 518 *U.S.* 515, 533, 116 *S.Ct.* 2264, 2276, 135 *L.Ed.*2d 735, 752 (1996). It is now well settled that laws that dispense " 'dissimilar treatment [to] men and women who are . . . similarly situated' " violate the constitutional guarantee of equal protection. *Weinberger v. Wiesenfeld,* 420 *U.S.* 636, 653, 95 *S.Ct.* 1225, 1236, 43 *L.Ed.*2d 514, 528 (1975) (quoting *Reed, supra,* 404 *U.S.* at 77, 92 *S.Ct.* at 254, 30 *L.Ed.*2d at 230); *see also Frontiero v. Richardson,* 411 *U.S.* 677, 688–91, 93 *S.Ct.* 1764, 1771–72, 36 *L.Ed.*2d 583, 593–94 (1973). "Administrative convenience" cannot serve as a justification for treating dissimilarly men and women. *Frontiero, supra,* 411 *U.S.* at 690, 93 *S.Ct.* at 1772, 36 *L.Ed.*2d at 594.

The United States Supreme Court has not hesitated to invalidate laws that have disfavored women who were similarly situated to their male counterparts. *See Weinberger, supra,* 420 *U.S.* at 637–38, 653, 95 *S.Ct.* at 1228, 1236, 43 *L.Ed.*2d at 518–19, 528 (striking down Social Security statute that unconstitutionally provided fewer benefits to survivors of female workers than provided to survivors of male workers); *Frontiero, supra,* 411 *U.S.* at 679–80, 690–91, 93 *S.Ct.* at 1766–67, 1772, 36 *L.Ed.*2d at 587–88, 594 (finding that rights of female service members were violated because, unlike their male counterparts, they had to prove dependency of their spouses in order to gain certain fringe benefits); *Reed, supra,* 404 *U.S.* at 72–73, 77, 92 *S.Ct.* at 252, 254, 30 *L.Ed.*2d at 227, 230 (holding that state probate law violated equal-protection rights of women by compelling preference for male estate administrators).

To justify treating one class differently than another under the law requires some cognizable distinction. *State v. Chun,* 194 *N.J.* 54, 101–04, 943 *A.*2d 114, *cert. denied,* 555 *U.S.* 825, 129 *S.Ct.* 158, 172 *L.Ed.*2d 41 (2008), presents just such an example. There, to assure that women over the age of sixty were not unfairly convicted of refusal to take the Alcotest, we allowed for that class of women—a class generally unable to give a minimum breath sample similar to men or younger women—to provide a lower

threshold breath sample. *Id.* at 98, 104, 943 *A.*2d 114. The immutable physical characteristic of women over the age of sixty—the inability to give an adequate breath sample—accounted for this favorable treatment and accorded with our conception of equal protection. *Ibid.*

However, we cannot manufacture distinctions to disfavor one group over another. Significantly, in *Lewis v. Harris,* 188 *N.J.* 415, 448, 451, 908 *A.*2d 196 (2006), committed same-sex and heterosexual married couples—despite the obvious differences in their sexual orientation—were deemed similarly situated under the New Jersey Constitution. On that basis, we declared that "denying rights and benefits to committed same-sex couples that are statutorily given to their heterosexual counterparts violates the equal protection guarantee of Article I, Paragraph 1" of our State Constitution. *Id.* at 423, 908 *A.*2d 196.

To the extent that comparisons can be made between men and women, A.L.S., who has no statutory basis to be named the natural mother of her non-genetic child, and the infertile married man, who under the Artificial Insemination Statute is entitled to be named the natural father of his non-genetic child, are similarly situated. This disparate treatment cannot be squared with our State Constitution's equal-protection guarantee.

## V.

"Equality of treatment is a dominant theme of our laws and a central guarantee of our State Constitution...." *Lewis, supra,* 188 *N.J.* at 456, 908 *A.*2d 196. Article I, Paragraph 1 of the New Jersey Constitution provides:

> All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness.

From this expansive language is derived one of the most fundamental of all rights—the guarantee of equal protection of the laws. *Lewis, supra,* 188 *N.J.* at 442, 908 *A.*2d 196. Under our equal-

protection jurisprudence, a legislative scheme that treats two classes of similarly situated people differently must "bear a substantial relationship to a legitimate governmental purpose." *Id.* at 443, 908 *A.*2d 196; *see also Caviglia v. Royal Tours of Am.,* 178 *N.J.* 460, 472–73, 842 *A.*2d 125 (2004).

In analyzing an equal protection challenge to a statutory scheme that does not apply evenhandedly to similar classes of people, we use a flexible, three-factor balancing test that weighs (1) "the nature of the right at stake," (2) "the extent to which the challenged [law] restricts that right," and (3) "the public need for the statutory restriction." *Lewis, supra,* 188 *N.J.* at 443, 908 *A.*2d 196; *see also Greenberg v. Kimmelman,* 99 *N.J.* 552, 567, 494 *A.*2d 294 (1985).

## A.

The right at issue is admittedly not a fundamental right. A married man does not have a fundamental right to be named the natural father of a child conceived by the sperm of an anonymous donor. The Artificial Insemination Statute confers that right on the husband. The right at issue is that of an infertile married woman to "equality of treatment relative to comparable" infertile married men. *See Lewis, supra,* 188 *N.J.* at 448, 908 *A.*2d 196. Under the Artificial Insemination Statute, infertile husbands—who have no genetic connection to the child—receive the benefit of parentage, and therefore need not pursue parental rights through the slower and more costly process of adoption. *See N.J.S.A.* 9:17–44. The Parentage Act confers no comparable benefits on infertile wives, like A.L.S., who are similarly situated. Importantly, the benefits conferred on the infertile husband are passed on to his child, who receives the promise of financial support, rights of inheritance, and myriad other statutory protections. The child in this case, whose surrogate carrier relinquished her parental rights seventy-two hours after his birth, is left legally motherless, and is disadvantaged in ways that the child of the infertile husband is not. *Cf. Lewis, supra,* 188 *N.J.* at 450–51, 908 *A.*2d 196. The

nature of the right—the right of an infertile wife to be considered a natural parent no different than an infertile husband—is substantial.

### B.

That right is significantly burdened by the failure of the Parentage Act to treat infertile wives equally. The time and cost involved in second-parent adoption is more than a mere inconvenience, as suggested by the concurrence; it is a considerable burden placed on the intended mother. *See* Anthony J. Vecchio, *Current Issue in Public Policy: The Unequal Application of New Jersey's Artificial Insemination Act,* 5 *Rutgers J.L. & Pub. Pol'y* 594, 608 (2008) ("[T]he adoption process in New Jersey can be time consuming and costly...."). A second-parent adoption will require the cost of retaining a lawyer, court fees, and ancillary expenses. *See N.J.S.A.* 9:3–48(a)(2) (providing for background investigation in adoption process, which necessarily involves expenditure of funds). The adoption process will take two to three months. During that period, the legally motherless child has none of the benefits or protections available to the non-genetic child of the infertile husband who is the automatic natural father under *N.J.S.A.* 9:17–44(a).

From the time the surrogate surrenders her rights to the child, *N.J.S.A.* 9:3–41(e), until the adoption process is completed, the child will have none of the many benefits "of having two legal parents." *See In re Parentage of Child of Robinson,* 383 *N.J.Super.* 165, 167, 890 *A.*2d 1036 (Ch.Div.2005). The child would not have priority to inherit from the intended mother should she die intestate. *See N.J.S.A.* 3B:5–4; *see also N.J.S.A.* 54:34–2(a) (providing reduced tax rate for inheritance of decedent's legal child). Moreover, in the absence of "a legally recognized parent-child relationship," the child is without "claims for ... workers' compensation benefits, social security benefits, and life insurance benefits." *See In re Adoption of Baby T.,* 311 *N.J.Super.* 408, 416, 709 *A.*2d 1381 (App.Div.1998); *see also In re Adoption of Child by*

*J.M.G.,* 267 *N.J.Super.* 622, 625, 632 *A.*2d 550 (Ch.Div.1993). In short, barring an infertile wife's right to natural parenthood disadvantages her intended children in a way that the non-genetic children of the infertile husband are not under *N.J.S.A.* 9:17–44.

### C.

Last, there is no legitimate public need to unnecessarily disadvantage the infertile wife, A.L.S., and the child she intends to raise as her own. Indeed, denying the infertile wife the opportunity to assert a parental right, after the surrogate surrenders her parental interests, leads to a result completely contrary to the purpose of the Parentage Act—a child without a *legal* mother responsible for the child's financial support. *See Robinson, supra,* 383 *N.J.Super.* at 169, 174–75, 890 *A.*2d 1036 (ruling that public policy establishes that interest of child is paramount and that benefits from having two legal parents include economic security, right to support, and right to inherit by intestacy).

Moreover, depriving A.L.S. and her intended child of the same rights as the infertile husband and his non-genetic child in no way addresses the "larger social issues" concerning surrogacy raised by the concurrence. *See ante* at 341–42, 54 *A.*3d at 267–68. As noted earlier, our laws do not prohibit gestational surrogates. By A.F.'s own admission, she knowingly entered into the surrogacy arrangement, and knowingly and voluntarily relinquished her rights to the child that she never intended to parent and to whom she has no genetic connection. That the State should regulate reproductive technology for the good of intended parents and surrogates is not disputed. The State has the power to do so. But that is not the issue before us.

In denying infertile wives the same rights as infertile husbands, the State must show " 'that there is an appropriate governmental interest suitably furthered by the differential treatment.' " *See Chun, supra,* 194 *N.J.* at 102, 943 *A.*2d 114 (quoting *Taxpayers Ass'n of Weymouth Twp. v. Weymouth Twp.,* 80 *N.J.* 6, 43, 364 *A.*2d 1016 (1976)). The obvious physical differences between men

and women alone cannot provide a sufficient justification for disparate treatment under the law.

Although the purpose of the Parentage Act was for "all children and parents [to] have equal rights with respect to each other," *see* Sponsor's Statement, *Statement to Senate Bill No. 888* (Jan. 19, 1982), that is not the case when one set of rights is granted to an infertile husband and his intended child, and a lesser set of rights is granted to an infertile wife and her intended child. In light of the rights conferred on an infertile husband by *N.J.S.A.* 9:17–44(a), there is no legitimate State interest in denying the infertile wife the ability to become the natural parent of the child conceived by her husband's sperm when the surrogate, seventy-two hours after the child's birth, lawfully relinquishes her parental rights. The surrogate's surrender of her rights places A.L.S., if not in the same shoes, in similar shoes as the infertile husband. The State's interest in a two-parent family is advanced, not impaired, by promoting equality of treatment in the circumstances of this case. *See In re Marriage of Buzzanca,* 61 *Cal.App.*4th 1410, 72 *Cal. Rptr.*2d 280, 289 (1998) ("It would be lunatic for the Legislature to declare that establishing paternity is a compelling state interest yet conclude that establishing maternity is not."). The arbitrary gender classification in this case cannot masquerade as a legitimate public need.

### D.

Balancing these factors leads to the inexorable conclusion that the Parentage Act, *N.J.S.A.* 9:17–38 to –59, as applied in this case, unconstitutionally discriminates against infertile wives similarly situated to infertile husbands. That is because infertile wives are granted inferior rights of parenthood. *See Buzzanca, supra,* 72 *Cal.Rptr.*2d at 286 ("If a husband who consents to artificial insemination under [the artificial-insemination statute] is 'treated in law' as the father of the child by virtue of his consent, there is no reason the result should be any different in the case of a married couple who consent to in vitro fertilization by unknown

donors and subsequent implantation into a woman who is, as a surrogate, willing to carry the embryo to term for them."). The disparate treatment of infertile wives based solely on their sex is not justified by any substantial government interest and is an arbitrary denial of A.L.S.'s right to equal protection of the laws.

## VI.

Both the Appellate Division and concurrence rely on *In re Baby M.*, 109 *N.J.* 396, 537 *A.*2d 1227 (1988), in support of rejecting A.L.S.'s equal-protection claims. However, *Baby M.* dealt with facts and issues not comparable to the present case.

*Baby M.* involved a contract between the husband of an infertile wife and a surrogate. *Id.* at 412, 537 *A.*2d 1227. The surrogate agreed to be inseminated with the husband's sperm, carry the child to term, and relinquish her parental rights in favor of the husband and his wife. *Ibid.* The contract apparently did not allow for the surrogate—the actual genetic mother of the child—to assert her parental rights after the birth of the child. *Ibid.* Although with considerable reluctance the mother initially surrendered Baby M., she later acted on her misgivings and fled with the child out of state. *Id.* at 415–16, 537 *A.*2d 1227. From these facts, the sensational case proceeded.

In *Baby M.*, we voided this surrogacy contract because the contract authorized the payment of $10,000 to the surrogate—the genetic mother—who was then obligated to surrender the child immediately upon the child's birth. *Id.* at 412, 422, 537 *A.*2d 1227. We made clear that an intended parent could not, by contract, automatically divest a surrogate from asserting her parental rights. *Id.* at 411, 430, 434–35, 537 *A.*2d 1227.

We did not declare void as against public policy surrogacy contracts that protect the rights of the birth mother to assert parentage after the child's birth. *Id.* at 411, 537 *A.*2d 1227. Indeed, we found "no offense ... where a woman voluntarily and without payment agrees to act as a 'surrogate' mother, provided

that she is not subject to a binding agreement to surrender her child." *Ibid.*

Surrogacy arrangements—such as the one in this case—are not uncommon in this State; no party has claimed otherwise or that they are illegal. Nothing in the record suggests that the surrogate here, A.F., was paid any money other than fees related to the birth of the child. The surrogacy arrangement here fully acknowledged A.F.'s ability to assert a parental right after the birth of the child. No contractual chains were placed on A.F. to restrict her options. Here, unlike the surrogate in *Baby M.*, A.F. clearly and unequivocally surrendered her parental rights to A.L.S. and T.J.S. This is not a case about an objecting surrogate. We do not have a legal contest between a man, whose sperm has conceived a child, and a surrogate, who has carried her genetic child to term. As stated earlier, had A.F. asserted a parental right this would be a different case. Lifting lines from *Baby M.* outside of the context of that case does not address, much less resolve, the issue before us.

Contrary to the concurrence's assertions, providing A.L.S. equal protection of the laws in no way diminishes the rights of the gestational surrogate. There is no conflict between the two. The concurrence simply ignores the sworn statements of the gestational surrogate—who voluntarily relinquished any parental interest in the child. Moreover, the concurrence insists on characterizing this case as involving the class of gestational surrogates who object to placing a child with the genetic father and intended mother. To be clear, it is not. This case is only about a gestational surrogate who has no interest in raising the child she has carried for the genetic father and intended mother.

## VII.

It also bears mentioning that the literalisms of the Parentage Act must conform to the equal-protection guarantee of our Constitution. In *Lewis v. Harris,* we declared "that our State Constitution guarantees that every *statutory right and benefit* conferred to

heterosexual couples through civil marriage must be made available to committed same-sex couples." 188 *N.J.* at 462, 908 *A.*2d 196 (emphasis added). As an example of a statutory disadvantage encumbering same-sex couples, we pointed out that the Parentage Act, as written, "provide[s] no comparable presumption of dual parentage to the non-biological parent of a child born to a domestic partner" and that, "[a]s a result, domestic partners must rely on costly and time-consuming second-parent adoption procedures." *Id.* at 450, 908 *A.*2d 196. We did not consider "second-parent adoption procedures" a mere inconvenience.

In deciding *Lewis,* we expected that the statutory benefits of the Parentage Act conferred on heterosexual couples would, in equal measure, extend to same-sex couples. We realized that in bridging the inequality gap, "[e]very statutory provision applicable to opposite-sex couples might not be symmetrically applicable to same-sex couples." *Id.* at 450 n. 18, 908 *A.*2d 196. Indeed, we noted that "the presumption of parentage would apply differently for same-sex partners inasmuch as both partners could not be the biological parents of the child" and therefore the presumption apparently "would be that the non-biological partner consented to the other partner either conceiving or giving birth to a child." *Ibid.*

Clearly, if the Parentage Act must be read in a constitutionally neutral fashion to afford same-sex couples equal protection of the laws, it must be read likewise to afford equal treatment for infertile wives, such as A.L.S. A plaintiff denied her constitutional rights under a statutory scheme that treats her differently on account of her sex does not have to wait until some day in the uncertain future for the Legislature to provide a remedy. Courts have the inescapable obligation to ensure that no person is denied the equal protection of the laws. *See Lewis, supra,* 188 *N.J.* at 441, 908 *A.*2d 196. That constitutional promise of equality cannot be a dream deferred—even if the political branches of government are stalemated.

## VIII.

An infertile husband and infertile wife do not have a fundamental right to be declared the natural parents of a non-genetic child conceived through assisted-reproductive technology. However, once the State creates a statutory right favoring the infertile husband and his intended child, as it has through the Artificial Insemination Statute, it cannot deny a similarly situated infertile wife and her intended child the same right. The State allows an infertile husband's name to be placed on the birth certificate of his non-genetic child through artificial insemination. Yet, the State arbitrarily refuses to allow the name of A.L.S. to be placed on the birth certificate of her intended child after the surrogate's knowing and voluntary relinquishment of her parental rights. This scheme unfairly disadvantages not just the infertile wife, but also her intended child. The unequal dispensation of benefits and privileges to an infertile married woman, A.L.S., on the basis of her sex abridges her right to the equal protection of the laws in violation of Article I, Paragraph 1 of the New Jersey Constitution.

For that reason, I would reverse the judgment of the Appellate Division. Because the Court is evenly split on whether to reverse that judgment, the judgment remains intact. I therefore respectfully dissent. Final resolution of the equal-protection issue in this case must await another day.

*For affirmance*—Justices HOENS, PATTERSON and Judge WEFING (temporarily assigned)—3.

*Dissenting*—Chief Justice RABNER, Justices LaVECCHIA and ALBIN—3.

*Opposed*—None.