# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0776-23

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Appellant,

v.

B.C. a/k/a D.V.,

      Defendant-Appellant/
      Cross-Respondent,

and

S.S.-C.,

      Defendant-Respondent.

_____

IN THE MATTER OF A.S.C.,
a minor,

      Cross-Appellant.

_____

Submitted February 4, 2026 – Decided March 16, 2026

Before Judges Mayer and Paganelli.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Mercer County, Docket No. FN-11-0070-19.

Jennifer Davenport, Acting Attorney General, attorney for appellant New Jersey Division of Child Protection and Permanency (Sookie Bae Park, Assistant Attorney General, of counsel and on the briefs; Meaghan Goulding, Deputy Attorney General, on the briefs).

Jennifer Nicole Sellitti, Public Defender, attorney for appellant/cross-respondent B.C. a/k/a D.V. (Amy M. Williams, Designated Counsel, on the briefs).

Jennifer Nicole Sellitti, Public Defender, attorney for respondent S.S.-C. (Clara S. Licata, Designated Counsel, on the brief).

Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney for minor cross-appellant A.S.C. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Julie E. Goldstein, Assistant Deputy Public Defender, of counsel and on the briefs).

PER CURIAM

Defendant B.C. a/k/a D.V. (Devin)[1] appeals from a May 22, 2023 Family

Part order. The order granted defendant S.S.-C. (Stephanie) the status of legal

and psychological parent of the minor A.S.C. (Ava) and required plaintiff the

New Jersey Division of Child Protection and Permanency (the Division) to name

---

[1] We use initials for the parties to protect their identities and pseudonyms for the ease of the readers. R. 1:38-3(d)(12).

Stephanie in the family guardianship litigation as a defendant parent.[2]  Devin also appeals from the court's July 20, 2023 order, denying reconsideration of the May 22, 2023 order.[3]  Ava cross-appeals from the May order.  We granted Stephanie's unopposed motion to realign the Division as an appellant.  Because we conclude the court misapplied the controlling legal precedent, we reverse both orders and remand.

## I.

The court's orders were issued following a plenary hearing over nine non-consecutive days from May 2022 to January 2023.  The purpose of the plenary hearing was to determine whether Stephanie was Ava's legal or psychological parent.  The court heard testimony from Devin; Stephanie; Division employees; a Division visitation provider; a social worker from the hospital where Ava was born; and experts, one qualified "in the field of

---

[2]  We are advised Ava's permanency plan has changed from termination of parental rights (TPR) to Kinship Legal Guardianship (KLG) with Ava being placed with Devin's relative who has his other children.

[3]  On appeal Devin contends he was provided with ineffective assistance of counsel.  See N.J. Div. of Youth & Fam. Servs. v. B.R., 192 N.J. 301 (2007).  As to relief he contends "[t]he appropriate remedy . . . is to vacate the order . . . that allowed [Stephanie] to remain in this case and for this [c]ourt to determine that she . . . is neither a legal nor psychological parent."  Given that our opinion provides the requested relief, albeit for different reasons, we decline to consider the contention here.

A-0776-23

psychology" and another "in the field of psychology and forensic psychology"; and Dr. David Brandwein, who was "qualified as an expert in the field of parent-child bonding evaluations."

"[W]e generally 'defer to the factual findings of the trial court because it has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a feel of the case that can never be realized by a review of the cold record.'" N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 396 (2009) (quoting DYFS v. E.P., 196 N.J. 88, 104 (2008)) (internal quotation marks omitted). "Factual findings by a trial judge are significant as '[o]nly the trial court has the opportunity to see, hear, and question . . . expert witnesses.'" Sipko v. Koger, Inc., 251 N.J. 162, 179 (2022) (alteration in original) (quoting Balsamides v. Protameen Chems., Inc., 160 N.J. 352, 368 (1999)). In general, "[t]he credibility of the expert, and the weight to be accorded his or her testimony, is assessed by the trier of fact[.]" State v. Frost, 242 N.J. Super. 601, 615 (App. Div. 1990). Therefore, "[w]e defer to a trial court's factual findings 'when supported by adequate, substantial, credible evidence.'" C.R. v. M.T., 257 N.J. 126, 139 (2024) (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). "[W]e will accord deference unless the trial court's findings 'went so wide of the mark that a mistake must have been made.'"

N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007) (quoting C.B. Snyder Realty, Inc. v. BMW of N. Am., Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)). "However, a 'trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference.'" Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 115 (2014) (quoting Town of Kearny v. Brandt, 214 N.J. 76, 92 (2013)) (internal quotation marks omitted).

We glean the relevant facts from the trial court record. Devin[4] and Stephanie were married in June 2017. They decided to have a child and engaged in a "threesome" with a male for that purpose. Because Stephanie "had not had successful pregnancies in the past," "they decided as a couple" that Devin would "carry the child."

In December 2018, there were allegations of domestic violence and Stephanie left the "marital home." Nevertheless, Stephanie returned to the home "a short time later."

---

[4] The parties' label their marriage as a same-sex marriage. Devin was "assigned female at birth, but . . . identifies as male." We acknowledge Devin's identifying as male. Our analysis is based on the same-sex marriage only insofar as it is relevant to the statutory interpretation at issue. We intend no disrespect to Devin.

A-0776-23

Ava was born in January 2019. Stephanie was present at the hospital for Ava's birth. Stephanie "testified that she and [Devin] had a conversation after [Ava's] birth." She stated that Devin "told her that [Ava] was her daughter and that he would sign the birth certificate stating that they were 'still married.'" Stephanie further testified that she and Devin "were present together at the hospital when the baby's name was selected." She stated, "that she suggested the child's first name to which they agreed" and, after Devin rejected his mother's name as the baby's middle name, they agreed that Stephanie's "mother's name w[ould be] used as the child's middle name." The court found Stephanie's testimony regarding the naming of Ava and the completion of the birth certificate paperwork "[w]as . . . credible and likely." The court also found Devin's testimony "regarding the naming of the child [wa]s contradictory."

The Division was contacted after Ava's birth because of Devin's "mental health" and his "past Division history," including the "termination of [Devin]'s parental rights on two previous occasions, substance abuse while pregnant, and lack of provisions to care for a child."

The Division filed a verified complaint under N.J.S.A. 9:6-8.21 and N.J.S.A. 30:4C-12 and was granted care and supervision of Ava. Stephanie was named in the complaint and identified as Devin's wife because of their legal

marriage. Ava was to "remain in the care of" Stephanie. Devin was "not in agreement with [Stephanie] having h[is] child" because Stephanie was "not the birth parent." Devin offered his friend to serve as a resource parent for Ava.

In August 2019, following concerns about ongoing contact and/or domestic violence between Devin and Stephanie, and allegations concerning individuals in Stephanie's home, the Division conducted an emergency removal of Ava from the home and placed her in a resource home. The Division amended its complaint to include a provision seeking custody. Devin consented to Ava's removal from Stephanie because of safety concerns.

The Division continued to work with and provide services to Devin and Stephanie. In December 2021, Devin moved to dismiss Stephanie from the litigation, arguing that she was not Ava's legal parent. Stephanie opposed the motion and also argued that she was Ava's psychological parent. The Division asserted Stephanie was not Ava's legal parent but took no position on whether Stephanie was Ava's psychological parent. On behalf of Ava, the Law Guardian contended that Stephanie was not Ava's legal parent and requested expert evaluations to determine whether Stephanie was Ava's psychological parent.

The court decided to conduct a plenary hearing to address Devin's motion. In addition, the court approved termination of parental rights (TPR) for Ava's

permanency plan. In March 2022, the Division filed a guardianship complaint but did not name Stephanie as Ava's parent.

In January 2023, after the plenary hearing concluded, the Division filed an amended verified complaint naming Ava's purported biological father. The father submitted to a paternity test which confirmed he is Ava's biological parent. On February 10, 2023, the biological father executed a general surrender of his parental rights to Ava and his rights were terminated.

The court issued a one-hundred-and-nine-page written decision accompanying its May 22, 2023 order. In sections II and III of this opinion, we address whether Stephanie is Ava's legal parent or, alternatively, Ava's psychological parent.

## II.

In determining whether Stephanie was Ava's legal parent, the court framed the issue as: "Is a same[-]sex married couple entitled to the same presumption of legal parentage as an opposite[-]sex couple?" The court explained, "[t]he presumption of legal parentage in an opposite-sex marriage is based on the biological presumption that sexual relations within the context of a marriage between spouses conceived a child." However, the court noted "[i]mplicit in the presumption is that the child was conceived as part of the sanctity of that

A-0776-23

marriage" and "[t]hat biological presumption is not possible in same[-]sex marriages."

The court stated that "[i]n Garden State Equality v. Dow, 216 N.J. 314 (2013), our Supreme Court confirmed the principle that the New Jersey Constitution guarantees same-sex couples in committed relationships the same rights and benefits of married couples of the opposite-sex.  Id.[] at 318." Further, it stated that in Lewis v. Harris, 188 N.J. 415, 423 (2006), the Court directed that "in the context of applications for marriage licenses for same-sex couples . . . the State [was] to 'provide to committed same-sex couples, on equal terms, the full rights and benefits enjoyed by heterosexual married couples.' Id.[] at 463."

The court considered the Division's arguments "that there is no legal presumption that either a valid marriage or birth certificate confers parentage rights alone"; that "N.J.S.A. 9:17-43 creates a presumption of paternity for a man only"; the "plain language of the statute refers to 'males, paternity, and/or fatherhood'"; and "In re[] T.J.S., 212 N.J. 334, 336 (2012) holds that the

presumption of paternity in the statute cannot be understood or interpreted to create a presumption of maternity."[5]

The court concluded the arguments raised "r[a]n afoul of the Supreme Court's pronouncements regarding the rights of same[-]sex couples, and by extension, the rights of individuals involved in same[-]sex relationships, in Lewis, and subsequently, Garden State Equality."  Moreover, the court found the arguments "eviscerate[] the presumption that a child can be conceived as part of the sanctity of marriage of same[-]sex couples."  (Citing In re Trust Created by Agreement Dated Dec. 20, 1961, 166 N.J. 340 (2001) (holding a child born in wedlock is presumed to be the legitimate offspring of the spouses.)).

The court concluded it did "not have to strike down [N.J.S.A. 9:17-43] to protect the benefit of the marital presumption."  Instead, relying on Garden State Equality, the court determined "[s]ame[-]sex spouses may still use the statutory scheme to confirm legal parentage."  However, "[t]hey just do not have to

---

[5]  Our opinion, In re T.J.S., 419 N.J. Super. 49 (App. Div. 2011), was "affirmed by an equally divided [Supreme] Court," In re T.J.S., 212 N.J. 334, 335 (2012), therefore, the Court's "concurring and dissenting opinions are not precedential." Mt. Holly Twp. Bd. of Educ. v. Mt. Holly Twp. Educ. Ass'n, 199 N.J. 319 n.2 (2009) (citing Abbamont v. Piscataway Twp. Bd. of Educ., 314 N.J. Super. 293, 301 (App. Div. 1998), aff'd, 163 N.J. 14 (1999)).  Nevertheless, because our opinion was published, it is precedential.  See R. 1:36-2.

navigate it to be conferred the presumption of legal parentage if a child is born of the marriage.  Lewis guarantees equal treatment under the law to same[-]sex couples."  Therefore, "a same-sex spouse is entitled to the same presumption, despite the statute using language such as 'man' and 'biological father.'"

The court also stated that "[w]hile a birth certificate does not confer parenthood, it can be evidence of the parents' intent."  Further, the court stated, "while it may be the better course for non-biological parents to confirm their parentage through an adoption . . . it is their right to confirm what the State Constitution, as interpreted by the Supreme Court in Lewis and [Garden State Equality], has conferred, that being equal protection under the law."

Moreover, the court explained "the marital presumption of parentage is rebuttable."  The court noted the biological "father has chosen not to assert his parental rights" and "completed a voluntary general surrender thus renouncing his right to rebut the marital presumption."  The court found "[w]ithout [the biological father]'s rebuttal, the presumption remains" and, therefore, Devin "cannot rebut [Stephanie]'s presumption of parentage."  The court concluded "[a]s the presumptive legal parent, [Stephanie] was rightfully included in this

litigation, and under the circumstances of this case, has the right to stay in this litigation as a legal parent."

In denying reconsideration of its May 2023 order, the court explained T.J.S. was not "particularly applicable or relevant to the case" because it "pre-dates Garden State Equality . . . which changed everything." (Citation reformatted). The court stated "T.J.S. essentially fades into the rearview mirror . . . in the context of Garden State Equality and . . . Moreland v. Parks, 456 N.J. Super. 71 (App. Div. 2018) and cases of that nature." (Citations reformatted).

On appeal, Ava argues "the trial court's determination that [Stephanie] is [her] legal parent is rooted in legal error." She contends no statutory provision—under the Parentage Act, N.J.S.A. 9:17-38 to -59; the Gestational Carrier Agreement Act (GCAA), N.J.S.A. 9:17-60 to -68; the Legal Parentage Act (LPA), N.J.S.A. 9:17-69 to -71; or the "Artificial Insemination" statute, N.J.S.A. 9:17-44—bestows upon Stephanie the status of being her legal parent.

Devin argues the statutory presumption, N.J.S.A. 9:17-43, cannot apply to Stephanie. In addition, he contends the court erred because "[t]his is not at all an equal protection issue."

The Division contends Stephanie "has never claimed that she is Ava's natural mother, intended parent, adoptive parent, or co-parent; nor was Ava

12

conceived using artificial insemination or party to a gestational carrier," therefore Stephanie "did not facially fall within any of the statutorily-enumerated categories creating her a legal parent." Moreover, the Division asserts "the court performed legal gymnastics to reconcile" the "marital presumption of paternity" to find that Stephanie was Ava's "legal parent." The Division contends the court erred in "how it articulated the dispositive question" because "the inquiry that should control the outcome here—whether <u>any</u> biological female may rely on the paternity presumption to establish her legal parentage over" a child was answered in <u>T.J.S.</u>

Stephanie argues she was "entitled to the presumption" under N.J.S.A. 9:17-43 after the biological father executed a general surrender. Further, absent the presumption, she contends "the court was entitled to decide, under N.J.S.A. 9:17-43(d) based upon a preponderance of the evidence, whether a parent-child relationship existed." Stephanie also argues she is "considered a parent or guardian under N.J.S.A. 9:6-8.21(a) as a person who assumed responsibility for the care, custody, or control of a child, or as a stepparent" and she is a parent

under N.J.S.A. 9:2-13(f) because, under the statute, "the word 'parent' . . . means a natural parent or parent by previous adoption."[6]

We conclude the court erred, as a matter of law, because its decision incorrectly presupposes that a female spouse in an opposite-sex marriage would be treated differently than a female spouse in a same-sex marriage. Based on our opinion in T.J.S., that presupposition fails.

In T.J.S. we considered

> whether the . . . Parentage Act . . . recognizes an infertile wife as the legal mother of her husband's biological child, born to a gestational carrier, and, if not, whether the statutory omission violates equal protection by treating women differently than similarly-situated infertile men, whose paternity is presumed when their wives give birth during the marriage.
>
> [419 N.J. Super. at 50-51.]

We held "that the Parentage Act does not intend maternity in such a circumstance absent adoption and, in determining the parentage of a child, the legislation does not offend [equal protection]." Id. at 51.

---

[6] Neither N.J.S.A. 9:6-8.21(a) nor N.J.S.A. 9:2-13(f) address the establishment of parentage. As such we conclude these arguments do not "warrant discussion in a written opinion." R. 2:11-3(e)(1)(E).

A-0776-23

To provide context we briefly recite the facts from T.J.S. In T.J.S., the husband, Tom,[7] and the wife, Alice, were unable to have a child "through 'traditional' means because [Alice] could not carry a child to term." Thus, Tom and Alice arranged for the in vitro fertilization (IVF) of an ovum furnished by an anonymous donor using Tom's sperm. Ibid. Tom and Alice "entered into a gestational surrogacy agreement with [Ann], who consented to act as the gestational carrier. Following successful fertilization of the ovum, two viable human embryos were implanted into the uterus of" Ann. Ibid. "The embryos were biologically related to [Tom] and the anonymous ovum donor; thus, there [wa]s no genetic connection between the child born of this IVF procedure and either" Alice or Ann. Ibid.

Before the child's birth, Tom and Alice "sought . . . a declaration of parentage under the Parentage Act and a pre-birth order directing that their names be listed on the birth certificate as the child's parents and preventing [Ann] from being named as the mother." Id. at 51-52. They sought to avoid "the extended legal process" of adoption and did not want to "place the legal status of the child in limbo." Id. at 52.

---

[7] We use pseudonyms for the initials that were used in the opinion for the ease of the reader here.

15

The trial court ordered the child's birth certificate should "reflect [Tom] as the father and [Alice] as the mother, provided that, as to the latter, the gestational carrier, [Ann], surrender her rights to the child seventy-two hours after giving birth." Ibid. Three days after the child was born, Ann "relinquished all parental rights to the child." Ibid.

After "the State Registrar learned of the pre-birth order . . . [it] promptly moved to vacate the portion of the order directing [Alice] to be listed as the mother on the child's birth certificate." Ibid.

Tom and Alice argued "that the provisions of the Parentage Act conferring paternity upon a husband either presumptively, where the child is born to the wife during marriage, N.J.S.A. 9:17-43(a), or by operation of law, where the wife is artificially inseminated with donor sperm, N.J.S.A. 9:17-44, should be read gender neutrally to apply to . . . [Alice] as well." Id. at 53. To hold otherwise, they claimed the statutes would be "facially unconstitutional because they treat differently similarly-situated groups—infertile married men and women—without sufficient justification." Ibid.

We rendered the following determinations in T.J.S. We concluded: (1) "birth certificates memorialize . . . information concerning the relationship of a child to his or her natural or adoptive parents" and the "birth certificate simply

16

records the fact of parentage as reported by others; it neither constitutes a legal finding of parentage nor independently creates or terminates parental rights," ibid.; (2) the Parentage Act "was designed to 'make the identification of a child's father easier and thereby reduce[] the number of children requiring public assistance[,]'" id. at 54 (alteration in original) (quoting Fazilat v. Feldstein, 180 N.J. 74, 87 (2004)); (3) the Parentage Act "defines the 'parent and child relationship' as 'the legal relationship existing between a child and the child's natural or adoptive parents,'" ibid. (emphasis omitted); (4) "[t]here are several means by which to establish a parental relationship under the [Parentage] Act: ([i]) genetic contribution, N.J.S.A. 9:17-41; ([ii]) gestational primacy, i.e., giving birth, N.J.S.A. 9:17-41(a); or ([iii]) adoption, N.J.S.A. 9:17-41(c)," ibid.; and (5) "a rebuttable presumption of paternity derives from the parties' legal relationship, i.e., marriage or its equivalent, when a child is born during the course of a marriage or within 300 days of its termination," ibid. (citing N.J.S.A. 9:17-43(a)(1)), and the presumption "extends to a husband who consents to his wife being inseminated with donor sperm under the supervision of a licensed physician." Id. at 54-55 (citing N.J.S.A. 9:17-44(a)).

We concluded that

> [n]owhere in the [Parentage] Act does the presumption
> of parentage under Section 43(a) extend to a wife whose

husband, while married, fathers a child with another woman, N.J.S.A. 9:17-43(a)(1), or to a wife who simply acknowledges in writing her maternity of the child, N.J.S.A. 9:17-43(a)(6). On the contrary, where a husband has a child, born to another woman, while married to his wife, the wife may only establish a parental relationship with the child by adoption. N.J.S.A. 9:3-37 to -56. Similarly, the [Parentage] Act contains no comparable analogue to Section 44 that renders an infertile wife, by operation of law, the natural mother of a child born to another woman artificially inseminated with the husband's sperm and with the wife's consent. . . .

[Id. at 55.]

We rejected "the gender-neutral interpretation plaintiffs ask[ed] us to adopt, [because] the plain language of the [Parentage] Act provides for a declaration of maternity only to a biologically—or gestationally—related female and require[d] adoption to render [Alice] the mother of" the child. Ibid. (citing N.J.S.A. 9:17-41). We stated "[n]o alternative construction is plausible and nowhere in the statutory scheme may it be implied that maternity is established simply by the contractual or shared intent of the parties." Ibid. "Simply put, the Legislature has determined when a woman is the legal mother of a child, N.J.S.A. 9:17-41(a), and it does not include the present circumstance." Id. at 56.

A-0776-23

In the fifteen years since our opinion in T.J.S., the Legislature has not amended the Parentage Act.  "The Legislature is presumed to be aware of the decisional law of this State."  Farmers Mut. Ins. Co. of Salem v. N.J. Prop.-Liab. Ins. Guar. Ass'n, 215 N.J. 522, 543 (2013).  "[W]here a statute has been judicially construed, the failure of the Legislature to subsequently act thereon evidences legislative acquiescence in the construction given the statute."  White v. Twp. of N. Bergen, 77 N.J. 538, 556 (1978).  However, "the so-called doctrine of legislative inaction" is not as "reliable" as "the doctrine of probable legislative intent."  Amerada Hess Corp. v. Dir., Div. of Tax'n, 107 N.J. 307, 322 (1987).  Indeed, the Court has stated that "[l]egislative inaction has been called a 'weak reed upon which to lean' and a 'poor beacon to follow' in construing a statute."  Ibid.

Nevertheless, "[t]here is ample precedent in New Jersey to support the proposition that, when a statute has been judicially construed, the failure of the Legislature subsequently to act is evidence of legislative acquiescence in the construction given to the statute."  Green v. Jersey City Bd. of Educ., 177 N.J. 434, 445 (2003) (quoting Cavuoti v. N.J. Transit Corp., 161 N.J. 107, 133 (1999)); see also In re Mun. Election Held, 139 N.J. 553, 559 (1995) ("Legislative acquiescence in the interpretation of a statute for three decades

19

provides some assurance that our interpretation comports with the intent of the Legislature.").

Moreover, "[t]he persuasive effect of such legislative inaction is increased where the statute has been amended after a judicial construction without any change in the language so interpreted." State v. Szemple, 135 N.J. 406, 430 (1994), superseded on other grounds by statute, N.J.S.A. 2A:84A-23 (quoting Lemke v. Bailey, 41 N.J. 295, 301 (1963)). Indeed, effective May 30, 2018, the Legislature amended N.J.S.A. 9:17-43, see N.J.S.A. 9:17-43(f) when it adopted the GCAA, N.J.S.A. 9:17-60 to -68. However, the Legislature left undisturbed the presumption in the Parentage Act regarding males.

We conclude our opinion in T.J.S. controls this appeal. Similar to Alice, the female wife in T.J.S., Stephanie bears "no genetic connection" to Ava. See T.J.S., 419 N.J. Super. at 51. Stephanie's same-sex spouse, Devin, and the biological father have the only genetic connection to Ava. Under these circumstances, as in T.J.S.—where the biological male husband, Tom, and the ovum donor had the only genetic connection to the child—Stephanie can only establish parentage through adoption. See id. at 55. Stephanie, like Alice, is not entitled to a presumption of parentage. Therefore, Stephanie's claim, regarding the denial of equal protection, fails because she is treated exactly like

any other non-genetically connected female spouse. Because there was no adoption, Stephanie is not the legal parent of Ava and should not have been named in the guardianship complaint.

Because we conclude Stephanie was not entitled to a presumption of parentage, we need not examine in detail the court's conclusion that Stephanie could have maintained the presumption despite paternity being established in the biological father or by virtue of the biological father's surrender of his parental rights. Clearly, DNA evidence of biological paternity would rebut the presumption of paternity of another. See N.J.S.A. 9:17-43(b) ("A presumption under this section may be rebutted in an appropriate action only by clear and convincing evidence."). Moreover, the biological father's surrender does not obviate evidence of his parentage. Under either circumstance, even if Stephanie was entitled to a presumption, and she was not, we are satisfied the presumption was rebutted based on the undisputed evidence.

## III.

In its May 22, 2023 order, the court concluded that Stephanie qualified as a psychological parent and amended the Division's guardianship complaint to name Stephanie as a defendant parent. In its accompanying decision, the court cited the standard enunciated by the New Jersey Supreme Court in

21

V.C. v. M.J.B., 163 N.J. 200 (2000), and our opinion in W.M. v. D.G., 467 N.J. Super. 216 (App. Div. 2021).

The court found that Devin "consented to and fostered a parent-like relationship between" Ava and Stephanie. The court recited Stephanie's testimony that she: "and [Devin] had conversations about starting a family prior to their marriage"; "was present for prenatal doctor's visits including the ultrasound where the sex of the child was determined"; "was at the hospital and in the delivery room when [Ava] was born"; and was involved in naming Ava.

The court recounted Devin's testimony regarding Ava's conception, and found it "evidence[d] 'joint participation in the family's decision to have a child' and [wa]s 'probative evidence of the legally recognized parent's [Devin's] intentions.'" (Citing V.C., 163 N.J. at 25). Further, the court considered Devin's testimony that Stephanie went with him to all but two doctor's appointments and the "plan [was] for the two of them to raise the child together." The court found Devin's testimony "that he would not concede custody nor sign his rights to" Stephanie was contradicted by his October 5, 2020 writing, while pregnant, that he was "giving all parental rights to" Stephanie and "want[ed] no dealings with [Stephanie] or the baby." (First alteration in original).

The court concluded that Devin "consented to and fostered a parent-like relationship between [Stephanie] and [Ava], thus establishing the first element of the psychological parenthood analysis."

Moreover, the court found "[t]he record [wa]s clear that [Stephanie] and [Ava] lived in the same household from . . . January 2019 through August 2019." The court further found Stephanie "was [Ava]'s primary caretaker" and "had supervised and unsupervised overnight visitation with" Ava. The court determined there was no requirement that Devin, Stephanie, and Ava had to live together, so long as Stephanie and Ava had lived together. Thus, the court concluded "the second element of the psychological parenthood analysis [wa]s established."

Further, the court found Stephanie "assumed the obligations of parenthood for [Ava] from her release from the hospital in January 2019 until August 5, 2019." The court determined Stephanie had "continued her involvement in [Ava]'s care and development through her participation in both supervised and unsupervised overnight visitation." The court stated "Dr. Brandwein testified that [Stephanie] provided care for the child 'during a critical period of her life.'" Moreover, Dr. Brandwein testified that when Ava was removed from Stephanie, Stephanie "did not 'walk away,'" and "[i]nstead chose to continue her

23

involvement with . . . [Ava] through visitation and continued to build a relationship with" Ava. The court found "Dr. Brandwein's analysis was . . . considerate of the totality of the circumstances by which [Stephanie] assumed the role of a primary caregiver at the initial stages of [Ava]'s life and how it carried through to the time of his evaluation." Thus, the court concluded Stephanie had "established the third element of the psychological parenthood analysis."

Lastly, the court considered whether Ava was bonded with Stephanie. The court repeated its finding that Stephanie "assumed the obligations of parenthood for [Ava] from her release from the hospital . . . through August 5, 2019" and continued to be involved in Ava's "care and development through supervised and unsupervised overnight visitation." Moreover, the court found Stephanie "provided the day-to-day care to [Ava] that would be expected from a parent." The court stated "Dr. Brandwein opined that from a psychological perspective, [Ava] and [Stephanie] 'share a secure bond and that . . . [Ava] relie[d] on [Stephanie] to meet parental functions' of security, stability, safety, nurturing, and attachment" and Stephanie "'imbues' . . . 'with the characteristics of a parent.'" The court concluded Stephanie had "established the fourth element of

24

the psychological parenthood analysis in that a parent-child bond ha[d] been forged between" Stephanie and Ava.

On July 17, 2023, in a decision placed on the record, the trial court denied reconsideration regarding its psychological parent determination. The court relied upon its May 2023 decision and stated that "it was the parties' actions that satisfied prong one of the psychiatric parenthood analysis." The court stated it did not find that "there was an estoppel" and "discounted any conduct of the Division as to the creation of the relationship."

On appeal, Ava argues "the facts accepted by the court were legally insufficient to satisfy prong one of the V.C. test." She contends Devin "was stripped of the ability to effectuate any plan for Ava soon after she was born." Further, Devin "explicitly and continuously opposed [Stephanie]'s relationship with Ava from the time of her birth and removal." Ava asserts the trial court erred by focusing on "events that occurred before [she] was born," despite "the need to demonstrate that a parent [must] actively facilitate[] the child's relationship with an individual while it was actually developing." In addition, Ava contends that "[t]o the extent that [Stephanie]'s visits with [her] created a parent-child bond, they were governed by the court and the Division, not" Devin. Lastly, Ava argues that even if Stephanie were her psychological parent, that

"status would place [Stephanie] on equal footing with [Devin] in a contested custody or visitation action only as 'between them[.]'" (Third alteration in original) (emphasis omitted) (quoting Tortorice v. Vanartsdalen, 422 N.J. Super. 242 (App. Div. 2011)).

Devin contends, as to the first prong of V.C., "[t]he record is clear that [he] never consented to, and surely did not foster, any relationship between [Stephanie] and Ava, and the trial court's legal conclusions, necessarily founded on such factual finding, are faulty and unsupported by the evidence." Devin argues Stephanie "cannot demonstrate the required first prong under the psychological parent test." Further, he adds that Stephanie failed to demonstrate the third prong. Moreover, he argues even if Stephanie was a psychological parent, such a finding "would only affect custody."

The Division argues Devin "did not 'consent to and foster the relationship between'" Stephanie and Ava "as needed to meet prong one of the V.C. test." The Division concedes Stephanie satisfied prong two, but notes "Ava only lived with [Stephanie] for the first few months of her life and over the objection of" Devin. It contends Stephanie cannot meet prong three because she "never performed any parental functions to a significant degree." The Division disagrees with the court regarding prong four but notes Stephanie cannot sustain

her overall burden because she fails to establish the other prongs. The Division adds that "even if the court correctly found [Stephanie] to be Ava's psychological parent, that finding does not create legal parenthood or extend parental rights to that person." (Citing Tortorice, 422 N.J. Super. at 251-52).

Stephanie argues she satisfied the four prongs under V.C. to establish psychological parentage. As to the first prong, she notes the court found Devin "consented to and fostered a parent-like relationship" by relying on: the parties' "conversations about starting a family and their plan to raise the child together"; Devin's "'graphic' testimony about the threesome that brought about the conception"; and "the undisputed testimony that [Stephanie] was present at the hospital for the birth of the child and had participated in prenatal visits."

Further, Stephanie contends she satisfied the second V.C. prong because "there [i]s no dispute that [she] and [Ava] lived together from January 2019 through August 2019, that during this time she was the child's primary caretaker, and that she had unsupervised overnights during the pendency of the litigation."

Stephanie argues that she established the third V.C. prong. She notes the court found she took responsibility for Ava after her release from the hospital and remained involved thereafter. Lastly, as to the fourth V.C. prong, Stephanie

notes the court found a parent-child bond based on the testimony of Dr. Brandwein.

Stephanie contends that "[s]hould [we] determine [she] is not the legal parent of [Ava], psychological parent status still confers on [her] at least the right of visitation, if not custody."

The New Jersey Supreme Court has held that to establish psychological parentage,

> [1] the legal parent must consent to and foster the relationship between the third party and the child; [2] the third party must have lived with the child; [3] the third party must perform parental functions for the child to a significant degree; and [4] most important, a parent-child bond must be forged.
>
> [V.C., 163 N.J. at 223.]

The Court was "satisfied that that test provides a good framework for determining psychological parenthood in cases where the third party has lived for a substantial period with the legal parent and her child." Ibid.

The Court explained that "[p]rong one is critical because it makes the biological . . . parent a participant in the creation of the psychological parent's relationship with the child." Id. at 224. Thus, "the legal parent must have fostered the formation of the parental relationship." Ibid. In describing the meaning of "fostered," the Court stated it "meant that the legal parent ceded over

28

to the third party a measure of parental authority and autonomy and granted to that third party rights and duties vis-a-vis the child that the third party's status would not otherwise warrant." Ibid. Indeed, the Court stated:

> The requirement of cooperation by the legal parent is critical because it places control within his or her hands. That parent has the absolute ability to maintain a zone of autonomous privacy for herself [or himself] and [t]he[] child. However, if she [or he] wishes to maintain that zone of privacy she [or he] cannot invite a third party to function as a parent to her [or his] child and cannot cede over to that third party parental authority the exercise of which may create a profound bond with the child.
>
> [Ibid.]

The Court clarified "[t]wo further points concerning the consent requirement." Ibid. First, "the focus is on [the legal parent]'s intent during the formation and pendency of the parent-child relationship." Ibid. "[S]econd . . . participation in the decision to have a child is not a prerequisite to a finding that one has become a psychological parent to the child." Id. at 225. However, "joint participation in the family's decision to have a child is probative evidence of the legally recognized parent's intentions." Ibid.

The Court stated that "[e]stablishing psychological parenthood is not an easy task and the standards . . . should be scrupulously applied in order to protect the legal parent-child relationship." Id. at 230.

A-0776-23

"Once a third party has been determined to be a psychological parent to a child, under the . . . standards, he or she stands in parity with the legal parent." Id. at 227. Thereafter, "[c]ustody and visitation issues between them are to be determined on a best interests standard giving weight to the factors set forth in N.J.S.A. 9:2-4." Id. at 227-28. However, "[n]either the language nor reasoning in V.C. supports th[e] proposition" "that the parity created between legal parent and psychological parent invests the psychological parent with the constitutional protections enjoyed by a legal parent as to third parties." Tortorice, 422 N.J. Super. at 250.

Applying this well-established law and considering our standard of review, we conclude the court erred in applying the facts to find Stephanie established prong one of the V.C. test. See Manahawkin Convalescent, 217 N.J. at 115 ("[A] 'trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference.'") (Quoting Brandt, 214 N.J. at 92) (internal quotation marks omitted). Because V.C. requires a party to establish all four prongs of the V.C. analysis, the failure to establish any one prong is fatal to a psychological parent finding.

In V.C., the Court stated that "joint participation in the family's decision to have a child is probative evidence of the legally recognized parent's

intentions." Id. at 225. Therefore, the court's consideration of Devin and Stephanie's pre-birth conversations, the manner of conception and attendance at prenatal doctor's appointments, was relevant. Similarly, the court's consideration of the parties' post-birth interactions, regarding Ava's name and her birth certificate, was relevant.

However, the record is devoid of any evidence that Devin "consented to, and fostered . . . a parent-like relationship" between Ava and Stephanie after Ava's birth. V.C., 163 N.J. at 223. Nor is there evidence that Devin "ceded over . . . a measure of parental authority and autonomy [or] granted . . . rights and duties vis-a-vis" Ava. Id. at 224. The Court stated "[p]rong one [wa]s critical because it makes the biological . . . parent a participant in the creation of the psychological parent's relationship with the child." Ibid. But here there is no evidence Devin was a participant in creating and fostering a parent-child relationship between Ava and Stepanie, much less a willing one.

Instead, in the early days after Ava's birth, Devin objected to Ava being released to Stephanie's care. In fact, Devin proposed a friend to be Ava's resource parent. From that point forward, Devin had no input regarding the relationship between Stephanie and Ava. On this record, Stephanie fails to

establish prong one under V.C. and therefore cannot establish she is Ava's psychological parent.

Reversed and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-0776-23